UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

------------------------------------------- X

LEGACY KNIGHT STRATEGIC
OPPORTUNITIES FUND – PARALLEL SERIES,

                             Plaintiff,

    -against-

WILLIAM "BEAU" WRIGLEY, JR., JAMES
HOLMES, JAMES WHITCOMB, SH PARENT
INC. d/b/a PARALLEL, and SURTERRA
HOLDINGS INC.

                           Defendants.

------------------------------------------- X

Case No. _____

JURY TRIAL DEMANDED

**COMPLAINT**

Plaintiff Legacy Knight Strategic Opportunities Fund – Parallel Series ("Legacy Knight") for its Complaint against Defendants William "Beau" Wrigley, Jr. ("Wrigley"), James "Jay" Holmes ("Holmes"), James Whitcomb ("Whitcomb"), SH Parent Inc. d/b/a Parallel ("Parallel"), and Surterra Holdings, Inc. ("Surterra," together with Parallel, the "Company" and with Wrigley, Holmes, and Whitcomb, the "Defendants"), alleges as follows:

**NATURE OF THE ACTION**

1.    This is an action against Beau Wrigley, Jr., heir to the Wrigley fortune, and associated individuals and entities, for: (1) committing federal securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder; (2) violation of Section 20(a) of the Exchange Act; (3) violation of Georgia Uniform Securities Act of 2008, Ga. Code. Ann. § 10-5-58; (4) violation of Georgia Uniform Securities Act of 2008, Ga. Code. Ann. § 10-5-58(g); (5) committing fraud and/or fraudulent inducement of contract; and (6) seeking rescission of contract.

2.      Wrigley, the Chairman and CEO of the Company during the relevant period, along with the other Defendants, fraudulently induced Plaintiff, by means of various misrepresentations and omissions about the Company's true financial condition, to enter into and invest $7.4 million in a so-called "SAFE" security—a Simple Agreement for Future Equity—issued by the Company.[1] Wrigley and the Defendants initially portrayed the SAFE as a way to maintain planned investments in operating and capital expenditures pending consummation of an announced public merger through a special purpose acquisition company ("SPAC").  After the merger talks terminated, the Defendants then sold the SAFE as a way to bridge the Company's operating and capital expenditures through the second quarter of 2022, and further represented to Plaintiff that they anticipated an alternative sale would be consummated by the end of 2021.

3.      In reality, however, the SAFE was a Ponzi-like scheme that used funds from Plaintiff to pay off earlier investors. Wrigley and the other Defendants were secretly just trying to keep the Company from collapsing under the weight of its debt by soliciting new investment funds. Indeed, among many other things, Wrigley and the other Defendants failed to inform the Plaintiff on September 20, 2021—the day that Plaintiff funded its $7.4 million investment—that the Company was about to experience a cascade of defaults on $300 million of its outstanding debt beginning just three days later.

4.      Following several months of discussions, Wrigley and the other Defendants were responsible for, among others, the following litany of misrepresentations and omissions designed to induce Plaintiff to enter the SAFE Agreement and provide the Company with $7.4 million:

(a)      That as of September 20, 2021—the day that Plaintiff wired its $7.4 million—the Company failed to advise that it was on the brink of: (i) covenant and payment

---

[1] The executed September 13, 2021 "SAFE" agreement is hereinafter referred to as the "SAFE Agreement."

defaults on $145 million of recently-issued junior debt; (ii) cross-defaults on $165 million of senior debt; and (iii) defaults on a $13.5 million promissory note issued by Wrigley's "family office," the Defendant PE Fund (the "PE Fund Note");[2]

   (b) That as of September 20, 2021, the Company also was in payment default on approximately $44 million of notes issued by Defendant Green Health (the "Green Health Notes")—a different Wrigley family office;

   (c) That, before Wrigley and his co-Defendants would move Plaintiff's money out from escrow, the total SAFE investment would reach $50 million as per Whitcomb's August 30, 2021 e-mail and Holmes' oral assurances; instead the Defendants moved the Plaintiff's funds in late September 2021 despite having fallen $10 million short of this threshold;

   (d) That, on June 30, 2021, PE Fund and the Company had violated the Company's junior debt by entering into the PE Fund Note on terms, devised by Wrigley, that were unconscionable;

   (e) That the $50 million SAFE investment would be used to fund capital expenditures that would bridge the Company through the end of the second quarter of 2022, when, in fact, the Defendants instead needed the money to make payments to creditors (including Wrigley's own PE Fund) in mere days and there was no conceivable way that the funds would last until the end of December 2021; and

   (f) That the Company's performance was actually quite different from what was presented to Plaintiff, making inconceivable the assurances of the funds lasting until the end of the second quarter of 2022, especially in light of the imminent violation of financial covenants under the Company's junior debt agreement.

---

[2] Unbeknownst to Plaintiff prior to investment, PE Fund also held $91.2 million of the Company's $165 million in senior debt.

5.      The Defendants made other misrepresentation and omissions to Plaintiff's detriment.  Holmes advised Sawyer in or about August 2021 that Wrigley would also be investing at least $5 million of the anticipated $50 million.  (Moreover, several times, the Defendants advised Plaintiff that there was upwards of $60-80 million in demand for the SAFE.).  Then Wrigley ignored this promise, and the SAFE closed without Wrigley's investment and well short of its promised $50 million investment level.  Wrigley's intent to defraud Plaintiff is evident from his own reluctance to throw good money after bad by refusing to commit even a tiny portion of his fortune to the SAFE.  It was not until several months later in November 2021 that Wrigley finally deposited approximately $10 million to get the SAFE up to $50 million.  Even then, upon information and belief, the Company had quietly used $3 million of the SAFE money deposited by Wrigley to pay back part of Wrigley's PE Fund Note, which means that while Wrigley was out soliciting "bridge" financing, he was actually taking $3 million out of the Company.

6.      The Defendants' urgent need for cash before the end of September 2021, and their willingness to make misrepresentations and omit relevant facts to obtain it, was a direct result of Wrigley's wasteful and incompetent leadership (as later confirmed by Whitcomb to Sawyer in a January 20, 2022 call).  By the summer of 2021, Wrigley had burdened the Company with enormous amounts of debt, and it could not make the required payments as they came due.  Upon information and belief, by the end of June 2021, as discussed above, the Company had incurred more than $350 million in debt, a portion of which—the PE Fund Note—constituted an undisclosed default of its Senior and Junior Note.  Significantly, although the existence of the note was disclosed to Plaintiff in a presentation received on or about August 10, 2021, the default was never disclosed.  Added to this was the Company's relatively poor recent performance—due, in

part, to an industry-wide decline and, in part, to Wrigley's incompetence as CEO—which meant the Company would fall far short of its own contemporaneous, optimistic projections.

7.      In fact, the Company artificially maintained a strong financial appearance in order to take Plaintiff's money, only to slash its projections just weeks later, and even more drastically thereafter. The side-by-side comparison of the Company's projections shown to Plaintiff pre-closing and post-closing is staggering:

|  | August 2021 | October 2021 | January 2022 |
|---|---|---|---|
| Projected 2022 Net Revenue | $618 million | $492 million | $362 million |
| Projected 2022 Adjusted EBITDA | $167 million | $99 million | $56 million |

8.      Stated differently, the Company cut its revenue projections for 2022 by 40 percent, and its EBITDA projections for 2022 by two-thirds, between the month before the Defendants took Plaintiff's money and just three months after.  The sheer magnitude of the revisions indicates that the Company's August 2021 projections—which Defendants used for purposes of marketing the SAFE to Plaintiff and which Plaintiff relied upon—lacked any reasonable basis or were intentionally false.

9.      Still, during the summer of 2021, Wrigley and the Defendants were aiming to put all of the above behind them through acquisition via Ceres Acquisition Corp. ("Ceres"), a SPAC, which at the time was backed by music industry mogul Scott "Scooter" Braun.  So, at that point, Wrigley and the other Defendants pitched the SAFE financing as a "bridge" until the SPAC could be completed.  But by August 2021, the original SPAC transaction value of $1.8 billion had been adjusted to just over $1 billion, and, regardless, Wrigley understood that the Company's poor performance would translate to poor performance in the public markets.  He therefore abandoned the SPAC transaction.

10.     To keep investors interested even after the SPAC opportunity had ended, Wrigley and the Defendants pivoted (before the truth about the Company could come out and ruin everything) and claimed that the Company was worth considerably more than the adjusted SPAC valuation, and would obtain much greater value through a third-party sale.  So, the Defendants stated that the Company needed a "bridge" until it could complete an alternative sale transaction. Holmes and Whitcomb supported this storyline by telling Plaintiff that industry players were lighting up their phones and lining up, unsolicited, to buy the Company.

11.     Plaintiff inquired as to how much capital the Company would actually need to operate until the end of the second quarter of 2022—by which time the Company expressed extreme confidence that it would be sold to a major industry player.  (Indeed, multiple assurances were made that the Company would be sold by year-end 2021.)  Whitcomb and/or Holmes claimed $50 million in SAFE funds would be enough, and the funds would be used to improve the Company's assets to make it even more attractive to a buyer while the Company completed its sales process.

12.     On the basis of these misrepresentations, and unaware of the Company's dire undisclosed financial situation, on September 20, 2021, Plaintiff advanced $7.4 million in SAFE financing to the Company.

13.     In fact, the Defendants had no basis to represent that the SAFE would tide the Company over until the end of the second quarter of 2022—let alone through the end of 2021.  The Company had defaulted, and was continuing to default, on its outstanding debt; it had incurred other obligations that it also could not pay; its projections were an inflated fiction; it needed the SAFE to make Ponzi-like payments to its other investors; and these and other performance issues meant it would run out of funds long before the end of the second quarter of 2022.  Upon

information and belief, the Defendants never intended to use the SAFE investment for operational purposes because that money was needed to pay the Company's significant debts beginning just days later.

14.     In November 2021 (but unbeknownst to Plaintiff until January 2022), having backed himself into a corner, Wrigley resigned as CEO, and his PE Fund (in its capacity as holder of $91.2 million of the Company's senior notes and not in its capacity as lender of the PE Fund Note) sent the first of the default notices to the Company.

15.     The junior creditors soon followed with their own more comprehensive notice, which first exposed that the making of the PE Fund Note itself was a default under the Junior Note (which in turn cross-defaulted the Senior Notes).

16.     Despite the fact that the Company promised regular reporting and quarterly financials, Plaintiff was never informed of these material events at the time they occurred and never received any regular reporting after it funded its investment in September 2021 (discussed below). And beginning in January 2022, Plaintiff began to learn for the first time the extent to which the Defendants had misrepresented the Company's condition and the actual nature of the Plaintiff's investment.

17.     The misconduct described above, and detailed herein, entitles Plaintiff to rescission of its investment together with costs, fees and other expenses, including fees and expenses for enforcing its rights.

## **PARTIES**

18.     Plaintiff Legacy Knight Strategic Opportunities Fund – Parallel Series is a Texas company with its principal place of business in Dallas, Texas.  Plaintiff invested $7.4 million in the SAFE.

19.     Defendant Parallel, a Delaware corporation, is a holding company that focuses on the development, production, and sale of cannabis products, oils, and extracts through subsidiaries, including in the State of Florida.  Its principal place of business is in Georgia.

20.     Defendant Surterra Holdings Inc. is a Delaware corporation with its principal place of business in Georgia and a registered agent in Florida.  Surterra is owned by Parallel.  Parallel and Surterra are referred to herein as the "Company."

21.     Non-party PE Fund, a Delaware limited partnership, is a holder of $91.2 million in the Company's Senior Notes and the holder of the PE Fund Note.  PE Fund is an investment vehicle within Wrigley's family office, and is controlled by Wrigley out of West Palm Beach, Florida.

22.     Non-party Green Health, a Delaware limited liability company, is a holder of $44.3 million of convertible secured notes issued by the Company. Green Health is an investment vehicle within Wrigley's family office, and is controlled by Wrigley out of West Palm Beach, Florida.

23.     Defendant Wrigley initially invested in the Company in 2017 and assumed day-to-day operations as Chairman and CEO in late 2018. Wrigley resigned as CEO effective November 19, 2021 when it became clear the Company would be disclosing various defaults, including one caused by his vehicle, PE Fund, under the Note Purchase Agreement (described below).  He continues to serve as Chairman of the Company.  Wrigley controlled Green Health and PE Fund at all relevant times.  Upon information and belief, Wrigley resides in Palm Beach County, Florida.

24.      Defendant Holmes was a director at the Company from September 2017 through November 2021, as well as its Chief Strategy Officer from January 2019 through December 2021.  Upon information and belief, Holmes resides in Palm Beach County, Florida.

25.     Defendant Whitcomb was the Company's Chief Development Officer until November 19, 2021, when he replaced Wrigley as CEO.  Upon information and belief, Whitcomb resides in Florida.

## JURISDICTION AND VENUE

26.     This Court has federal question jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

27.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391.

28.     The court has personal jurisdiction over Defendants because, on information and belief, Defendants Wrigley, Holmes, and Whitcomb reside in the State of Florida, all Defendants regularly conduct business in the State of Florida, and all Defendants transacted business relating to the causes of action alleged herein within the State of Florida, and/or committed tortious acts in the State of Florida, and/or committed tortious acts causing injury to persons or property in the State of Florida.

## FACTUAL BACKGROUND

### I.     THE COMPANY'S CAPITAL STRUCTURE

29.     As alleged above, Wrigley assumed control of the Company in late 2018. Almost immediately after doing so, he began to saddle the Company with substantial amounts of debt and other obligations.

### A.     The Senior Notes

30.     The most senior tranche of the Company's capital structure is $165.5 million in aggregate 10% Senior Notes due October 16, 2028 (the "Senior Notes") (plus interest as well as potential pre-payment penalties).   The Company incurred these obligations in October 2018,

almost immediately after Wrigley effectively assumed full control of the Company as Chairman and CEO.

31.     The Senior Notes were issued pursuant to, and are governed by, a Note Purchase Agreement ("NPA"), by and among the Company and holders of the Senior Notes, dated October 16, 2018.

32.     The Senior Notes are secured by first priority liens on, and security interests in, substantially all the assets of the Company, as well as each of its direct and indirect subsidiaries, pursuant to Section 3.01 of a Guarantee and Collateral Agreement dated October 16, 2018.

33.     PE Fund—which, again, Wrigley controls—holds $91.2 million of the Senior Notes, and is therefore their majority holder.

34.     Upon information and belief, beginning in or around June 2021, and continuing past September 2021, the Company defaulted on the Junior and Senior Notes in multiple ways.  In particular, the Company issued the PE Fund Note on June 30, 2021 to avoid defaulting on its obligations under the Bergmann Settlement (discussed below), only to breach covenants under the just-executed Junior Note (as defined below) which restricted the Company's ability to issue additional indebtedness and to enter into affiliate transactions (including with PE Fund).  The default, in turn, cross-defaulted the Senior Notes.  And then, as of September 30, 2021, the Company breached various financial tests and additional covenants of its Junior and Senior Notes.

35.     Defendants did not, however, disclose these defaults to Plaintiff until January 2022 which was well _after_ the Company took and used Plaintiff's $7.4 million in SAFE investment funds.

**B.     The Junior Note**

36.     The Company's second-largest debt obligation, which is junior to the Senior Notes, is $145 million of junior secured debt issued on May 7, 2021 (the "Junior Note") to SAF Group

("SAF") (plus interest as well as potential pre-payment penalties). SAF Group is an alternative investment management firm based in Canada.

37.     The Company used the Junior Note to refinance seller financing provided by the sellers of New England Treatment Access ("NETA"). NETA is a cannabis facility that the Company acquired in 2019. The Junior Note carries an annual non-default interest rate of 14.25%.

### C.     The Green Health Endeavors, LLC Convertible Secured Notes ("Green Health Notes")

38.     The Company also appears to owe approximately $54 million on $44.3 million of certain convertible secured notes issued to non-party Green Health. The Green Health Notes accrue interest at a rate of 16% per year, and carried a prepayment penalty of 25% (inclusive of all interest) had they been repaid before the May 1, 2021 maturity date.

39.     When the Green Health Notes were negotiated, Wrigley was Chairman and CEO of the Company and also the Chairman and CEO of Green Health. He was therefore conflicted, as he served as both lender and borrower in the Green Health Notes transaction, and had the ability to choose which side received the best deal.

40.     Needless to say, Wrigley selected Green Health to get the best deal. The Green Health Notes convert into preferred equity of the Company on extortionate terms that enrich Wrigley at the expense of the Company's stockholders. Specifically, under the terms of the conversion, the amount of accrued "debt" represented by the Green Health Notes is multiplied by 2.5x, such that Green Health's actual contribution of $44.3 million (now $54 million counting accumulated "interest") would be magnified into a shocking $135 million, and would convert into that amount of preferred stock.

41.     Upon information and belief, the Company conducted no arm's length negotiation over the financing terms of the Green Health Notes, and failed to explore other financing options

that might offer better terms.  In fact, Wrigley's lieutenant, Holmes, represented Green Health in the transaction, while also serving in his capacities as director and Chief Strategy Officer for the Company, and it is unclear who—if anyone—played the part of Company representative in the sham negotiations.  Holmes' positions at the two companies had one main feature in common: both reported directly to Wrigley.  Thus, both principal (Wrigley) and agent (Holmes) were conflicted in negotiating the Green Health Notes.

42.    Plaintiff does not have full insight into the specific uses of the proceeds from the Green Health Notes.  But it appears that Wrigley would periodically plug the Company's operating cash shortfalls by advancing funds from his family office, Green Health, and then taking, in exchange, a usurious note with equity-like returns for Green Health.  The characterization of these investments as "debt" is highly suspect.

43.    For example, upon information and belief, Green Health provided $6 million to the Company in January 2021, and took a convertible secured note in exchange.  Upon information and belief, that $6 million later converted into Series D Preferred Stock on the sweetheart terms described above.  Upon information and belief, the $6 million was used to pay the first installment on the Company's Bergmann Debts (described below).

44.    The total amount of approximately $44.3 million advanced under the Green Health Notes was amended and restated on May 7, 2021 through instruments referred to as the Third and Fourth Amended Green Health Endeavors Convertible Secured Notes ("Third and Fourth Amended Green Health Notes").  These two promissory notes likewise carried the same features as the original: interest accrual at a usurious 16% with a punishing prepayment penalty of 25% (inclusive of all interest) if repaid prior to the maturity date of May 1, 2021, and the 2.5-times multiplier to gouge stockholders if Wrigley preferred the conversion option—a decision he could

wait until the last minute to make, depending on the Company's prospects as observed from the C-suite.  (Although the 25% pre-payment obviously never took place, it reflects Wrigley's intent to provide for himself a minimum return of 25% on the short-term advance of funds).

45.     Upon information and belief, the fact that the Third and Fourth Amended Green Health Notes were executed as of May 7, 2021, with a past-due maturity date of May 1, 2021, means the notes were already in default upon execution.  Apparently realizing that fact, the Company also entered into an undisclosed forbearance agreement with Green Health on May 7, 2021, pursuant to which the Company purportedly waived any claims it might have against Green Health.  No information about those potential claims has ever been disclosed.  Upon information and belief, the forbearance agreement expired on October 31, 2021.

46.     But Wrigley's Green Health scheme was far from over.  On the same date as the forbearance agreement—May 7, 2021—the Company substituted the Third and Fourth Amended Green Health Notes with substitute or "restated" obligations (the "Fourth and Fifth Restated Green Health Notes").   The Company now inserted preconditions to the "restated" debts—albeit ceremonial ones—on the approval of Green Health Notes, including approval of: (i) a majority of disinterested directors; (ii) a majority of "Unaffiliated Directors," pursuant to the requirements of Section 8(w) of the Company's Stockholders Agreement; (iii) a majority of independent directors of SH Parent, pursuant to Section 10.2 of the NPA; (iv) the Required Holders, as defined in the NPA (*i.e.*, PE Fund, which was Wrigley); and (v) a majority of Company minority stockholders. The Company's and Wrigley's failures to require similar approvals and authorizations for previous iterations of the Green Health Notes was never explained, and the idea that one could fairly seek approvals of insider debts that are already in default is absurd.

47.     As a whole, the Green Health Notes were a sweetheart deal for Wrigley, negotiated on both sides by him and his lieutenant, Holmes.  Upon information and belief, Wrigley had no expectation that the nominal "debt" obligation would ever be repaid—indeed, the maturity windows were so artificial that the last two iterations of the debts were already in default upon issuance.  Rather, Wrigley intended to benefit from the relatively quick conversion of the Green Health Notes into a tranche of preferred stock that was, remarkably, senior to every other existing tranche and so jumped to the front of the liquidation line, ahead of all other preferred stockholders.

48.      Furthermore, there was no justification for the conversion to take place at an extortionate 2.5 times the accrued value of the Green Health Notes, such that the initial $44.3 million of capital would be fictionally treated as a staggering $135 million in preferred equity when the Company only received $44.3 million in consideration.  Upon information and belief, that figure was devised by, and for the benefit of, Wrigley.

**D.     The Bergmann Debts**

49.     Non-party Robert "Jake" Bergmann was a founder of the Company and its first CEO.  Wrigley succeeded Bergmann, who stepped down as CEO on November 5, 2018.

50.     A dispute between Bergmann and the Company arose over the value of Bergmann's common stock.  Upon information and belief, to resolve the dispute, and disregarding that Bergmann's interests should have been junior to all of the Company's debt and Preferred Stock obligations described herein, the Company entered into the Bergmann Settlement in or around January 2021.

51.     Under the Bergmann Settlement, the Company agreed to pay Bergmann $38.5 million (which valued each of Bergmann's 1.25 million common shares at $30.80).  Upon information and belief, on or about January 8, 2021, the Company made an initial $6 million payment to Bergmann.  As noted above, upon information and belief, the Company did not have

this $6 million in available funds, so Wrigley financed this initial payment through a Green Health Note.

52.     As part of the Bergmann Settlement, the Company obligated itself to pay the remaining $32.5 million to Bergmann (the "Bergmann Debts") by:

(a)     Obligating itself to pay $12.5 Million, which despite accruing interest at 16% and requiring payment of principal and interest at maturity six months later, was denominated a "second payment," rather than a promissory note or other debt instrument.  The Bergmann Settlement also carried the express understanding that the "second payment" would increase to $13.5 million if the Company did not make the payment before June 30, 2021; and

(b)     Issuing the "$20 Million Bergmann Note" at 16% interest and with amortization of $2.5 million every six months, with the first payment due June 30, 2021.

53.     Defendants did not disclose the Company's subsequent inability to satisfy its obligations under the Bergmann Debts before the Company took Plaintiff's $7.4 million.  Once the Company took Plaintiff's $7.4 million and converted it into equity, it would be subordinate to all Company debts.

E.     **The PE Fund Note, Which Breached The Prohibition Under the Junior Note Against Incurring Additional Prohibited Debt**

54.     Upon information and belief, as of June 30, 2021, and consistent with the Company's increasingly bleak (and undisclosed) financial landscape, the Company lacked the funds to make the "second payment"—now $13.5 million—under the Bergmann Settlement ($12.5 million plus $1.0 million late fee).  Upon information and belief, the Company also was unable to make the first $2.5 million amortization payment under the $20 Million Bergmann Note due June 30, 2021.

55.     To make up for some of the shortfall, Wrigley turned to PE Fund, of which his namesake family office is the General Partner.  Upon information and belief, on or about June 30, 2021, Wrigley caused PE Fund to advance $13.5 million to the Company in exchange for the PE Fund Note, which would then need to be repaid within six months.  The PE Fund Note transaction also included an unexplained (and inexplicable) $2.5 million "transaction fee," which would be added to the balance due at maturity on a note that already accrued interest at an exorbitant 16%, thus effectively increasing the annual interest rate to over 53% per annum.

56.     Defendants failed to disclose that the PE Fund Note constituted a default under the Junior Note, which then cross-defaulted the Senior Notes.

57.     Notably, the $13.5 million value of the PE Fund Note, along with the $2.5 million transaction fee, matches the $16 million presumably paid to Bergmann in June 2021 in connection with the Bergmann Settlement.  In other words, the $16 million that the Company previously owed to its former CEO Bergmann it now owes to PE Fund, and therefore to its own CEO at the time, Wrigley.

58.     For reasons similar to the Green Health Notes, the PE Fund Note transaction was a conflicted transaction, orchestrated by Wrigley acting on both sides for the benefit of his own entity.  In particular, it appears the funds advanced in connection with the PE Fund Note were used to pay Bergmann for his interest in the Company, which was held in common stock.  In other words, while the Company was beginning its downward spiral, the PE Fund Note was used to jump the line of priority to pay Bergmann—whose common equity interests were otherwise subordinate to every holder of debt and preferred stock.  Stated differently, Bergmann should not have received anything for his equity interest until all holders of debt and preferred equity were made whole.

F.    **Other Potential Debt Obligations**

59.    Finally, upon information and belief, there is up to $107 million of consideration that the Company owes in connection with its 2021 deal to acquire certain operations of Windy City Cannabis ("Windy City"), an Illinois-based cannabis dispensary.

60.    On information and belief, Wrigley recklessly entered into the Windy City acquisition knowing the Company lacked the means to pay for it, in an effort to bolster the prospects of closing the SPAC by expanding the Company's geographic footprint and augmenting the Company's EBITDA.  Windy City is now such a liability to the Company that it serves only to impede the very alternative acquisition transaction Wrigley claimed to be seeking.   Upon information and belief, the Windy City transaction was awaiting regulatory approval from the State of Illinois, though such approval still will not solve the Company's problem of how to actually pay the required consideration.

G.    **The Company's Remaining Capital Structure**

61.    Upon information and belief, as of April 2022, the total remaining invested capital was structured as follows:

(a)    Approximately $67 million[3] invested through SAFE securities that the Company is holding in cash or has transferred to operating subsidiaries; if not rescinded prior to conversion, the SAFE was to be converted into Series EE Preferred Stock on December 31, 2021. That conversion ultimately occurred;

(b)    $79 million in aggregate Series E Preferred Stock;

(c)    $166 million in aggregate Series D Preferred Stock; and

---

[3] This figure reflects the value of the SAFE investment—including Wrigley's post-closing supplement of more than $10 million (discussed below)—after conversion to Series EE Preferred Stock of the Company.

(d)      Certain additional interests of Preferred and Common Stock that are junior to the Series EE, Series E, and Series D Preferred Stock.

## II.      THE DEFENDANTS INDUCE PLAINTIFF TO ENTER SAFE AGREEMENT AND SOLICIT $7.4 MILLION IN SAFE FUNDING FROM PLAINTIFF THROUGH MISREPRESENTATIONS AND OMISSIONS

62.      On or about January 28, 2021, Plaintiff was introduced to Wrigley and Holmes in connection with a potential PIPE (private investment in public equity) transaction.  On or about February 12, 2021, the PIPE Subscription Agreement was executed by Plaintiff.

63.      Plaintiff began discussing the SAFE investment with the Defendants in or around August 2021. Between then and September 20, 2021, when Plaintiff funded its $7.4 million SAFE investment, the Defendants offered a litany of false and misleading statements and omissions concerning matters critical to the SAFE investment and the Company's finances.  Each of these was made intentionally, to induce Plaintiff to supply the Company with critically-needed capital against a false picture of the Company's financial condition, and contrary to federal and state anti-fraud securities laws, as well as common-law fraud principles.

64.      Crucially, at no time prior to the execution of the SAFE Agreement, did Wrigley, Holmes or Whitcomb disclose:

(a)      The Company did not actually have $50 million in SAFE commitments;

(b)      The Company's recent inability to meet the obligations under the Bergmann Debts;

(c)      The purpose of the PE Fund Note, or that its issuance defaulted the Junior Note, which in turn cross-defaulted the Senior Notes; or

(d)       That the Company had no foreseeable way to meet all of its existing obligations, including the Senior and Junior Note, the Green Health Notes, the PE Fund Note, and the $20 Million Bergmann Note.

### A.   The Defendants' Initial Claims and Omissions

65.   On or about August 5, 2021, David Sawyer, Chief Operating Officer and Managing Partner of Plaintiff participated in a Zoom call with Wrigley and Holmes.  During the call, Wrigley and Holmes explained that the SPAC transaction was being repriced at a lower value, and that the Company was looking to raise between $30 and $50 million as part of a new SAFE security. (Thereafter, Sawyer was told that interest from investors for the SAFE was in the $60-80 million range.)

66.   At this point, Wrigley and Holmes' story was that the additional funds would be "bridge" capital to fund the Company's capital projects and operating expenses until the SPAC could close.  (The Company also advised that the SPAC might not close but that the Company would be sold to a third party, and that there were numerous, interested third-party buyers.) Because the Company actually intended to use the SAFE proceeds to pay looming debt obligations to other investors, these statements concerning the use of the SAFE proceeds were materially false and misleading.

67.   Following up on the August 5, 2021 call, on or about August 10, 2021, Holmes sent an e-mail to Sawyer (copying Whitcomb and Wrigley) attaching the draft SAFE Agreement, SAFE risk factors and an "August 2021 Company Overview: Parallel/Ceres Acquisition Corp. SPAC transaction" presentation.

68.   The 64-page presentation outlined the proposed SPAC transaction with Ceres and provided purportedly updated and accurate information about the Company, its capital structure, and its financing needs. In particular, consistent with Wrigley's and Whitcomb's representations concerning the purposes of the SAFE financing, the presentation claimed that the Company "anticipates raising a $50 million SAFE to fund capex plan through SPAC closing (this will be

non-dilutive to PIPE and SPAC investors)." This presentation was likewise false and misleading because the Company intended to use the SAFE proceeds to attempt to stave off payment defaults on obligations to other investors, rather than for capital or operating expenses. Notably, as discussed below, the SAFE included risk "warnings" about the Company's debt that were misleading because the hypothetical "risks" they identified had in fact already materialized.

69.     The same presentation also projected that the Company's revenue for 2022 would be $618 million, and its adjusted EBITDA would be $167 million. Upon information and belief, in October 2021, shortly after the Defendants withdrew the Plaintiff's $7.4 million in funds from escrow, the Company revised those projections <u>downward</u> by approximately 20% and 40%, respectively, and again in early January by approximately 25% and 45% as compared to the October projections:

|  | **August 2021** | **October 2021** | **January 2022** |
|---|---|---|---|
| Projected 2022 Net Revenue | $618 million | $492 million | $362 million |
| Projected 2022 Adjusted EBITDA | $167 million | $99 million | $56 million |

In just the three months after Plaintiff provided its funds, the Company had lowered its revenue projections for 2022 by more than 40% and its EBITDA projections by 66%. The August 2021 projections were therefore false and misleading, and lacked any reasonable basis.

70.     Following the August 5, 2021 transmittal of this presentation, days later on August 13, 2021, Holmes e-mailed Sawyer (copying Whitcomb and Wrigley) advising that the Defendants had "$40m committed to the SAFE and are hoping to close in the next week or so, would love to have you all participate."

71.     On August 16, 2021, Sawyer sent an e-mail to Holmes advising that Plaintiff was interested in participating in the SAFE with an investment of between $5 million and $10 million.

On or about August 17, 2021, Sawyer had a Zoom call with Company executives, including Whitcomb and Holmes, regarding the SAFE investment.

72.     During the various communications between Plaintiff and the Defendants, Holmes, Whitcomb and Wrigley informed Sawyer that the Company's board of directors had approved increasing the maximum proceeds of the SAFE because they had demand in excess of $50 million. Defendants also discussed the reduced SPAC valuation and treatment of warrants.  The Defendants even represented to Sawyer that the lowered valuation was beneficial, because the Company's stock would outperform expectations once it began trading.

### B.     Defendants Change Their Story, But Continue Misrepresentations and Omissions

73.     On or about August 24, 2021, Sawyer had a further Zoom call with Holmes and Whitcomb about the SAFE Agreement and investment as well as the termination of the PIPE Investment. Notably, at or around this time, Holmes conceded that the pending SPAC transaction might not be consummated.  Pivoting to the new storyline, and despite knowing their revenue and EBITDA projections were completely unrealistic, he claimed the SPAC valuation was too low, the SPAC market was in decline, and the public shares would in any case be relatively illiquid because they would be listed on a Canadian exchange.  Instead, Holmes explained that the SAFE funding would be sufficient to fund the Company—and specifically its capital and operating expenses— until a private sale could be consummated.  These assertions were all false and misleading.  In fact, Holmes had no reasonable basis to claim the SAFE would bridge the Company until a private sale.  They were merely spinning a new tale to obtain badly-needed cash under false and fraudulent pretenses.

74.     On the August 24 call, Defendants reviewed in greater detail the Company's plans for capital expenditures through the end of 2022.  Defendants again indicated—again with no

reasonable basis—that $50 million would bridge the capital expenditure needs through the end of the second quarter of 2022.  They made this plain misrepresentation because Plaintiff, particularly through Sawyer, again sought assurance that the Company would not run out of funds before the sale process could be completed.  Holmes and Whitcomb noted that the Company might conceivably need to raise an additional $25-$50 million to sustain the Company through the end of 2022 after the $50 million SAFE investment had bridged the Company through second quarter 2022.

75.     Holmes and Whitcomb also again indicated to Sawyer that the $50 million would increase the operating cash to over $100 million which would be more than sufficient to fund the Company's capital and operating expenses—which, as noted above, was false—and also that the Company would use the SAFE funds for capital and operating expenses, and therefore not to make Ponzi-like payments on upcoming obligations to other investors.  In fact, during this same time period, the Company continued to emphasize that it would apply the SAFE funds to the Company's capital needs by walking the Plaintiff through its (supposed) capital expenditure plans, including funding growth in Florida, opening a new store in Massachusetts and funding a Texas operation. At no time during these detailed discussions about the use of proceeds did Defendants mention that the SAFE proceeds would instead be used to pay down the Company's impending debt obligations, which was a misleading omission totally inconsistent with the optimistic projections provided (presumably for exactly that reason) that also rendered false the Company's statements about its capital expenditure plans.

76.     Further, as of August 24, 2021, the Company lacked the commitments it assured Plaintiff that it had, and ultimately closed the SAFE and took Plaintiff's money without the $50 million in total commitments that Holmes and Whitcomb represented they had.  On the August 24,

2021 call, Sawyer explained to Holmes—not for the first time—that Plaintiff would commit funds to the SAFE only if Plaintiff was confident that: (i) the Company had significant SAFE and PIPE commitments already in hand, and (ii) the funds raised in connection with the SAFE would be a sufficient bridge until the Company could be sold.  Sawyer sought assurances that sufficient funds would be invested in the SAFE by other investors alongside the Plaintiff's proposed $5-10 million commitment (for a total of $50 million, which was the amount needed to get through the sale process).  Holmes and Whitcomb stated that the Company had more than $50 million in SAFE commitments *already in hand* and about $70-80 million in verbal commitments (including $5 million from Wrigley).  These statements were false in light of the fact that the Company did not have the minimum $50 million in funds in the SAFE account when it closed the SAFE, and took the Plaintiff's $7.4 million.

C.      **Plaintiff Enters SAFE Agreement Based on Defendants' Misrepresentations and Omissions**

77.     On August 25, 2021, Holmes sent an e-mail to Sawyer and Whitcomb attaching, *inter alia*, the Surterra Series E Fifth Amended and Restated Stockholder's Agreement.  Holmes advised that the "Series EE once constituted will share the same rights as Series E (attached for review) but will be senior in liquidation preference."

78.     On August 30, 2021, Holmes (copying Whitcomb) sent an e-mail to Sawyer advising that they had obtained "consents from the shareholders to proceed with the SAFE and intend to hold a first close this week most likely." Sawyer then sent an e-mail to Holmes and Whitcomb attaching an executed PIPE termination agreement, and Holmes later supplied a counter-signed version.

79.     Also on August 30, 2021, Whitcomb sent a separate e-mail to Sawyer and Holmes concerning closing the SAFE transaction.  He indicated—again falsely—that "this is a structured

close for $50 m[illion] coming from multiple investors.  Any paperwork you sign prior to then (which we would like you to do) will be held in escrow until close."  In fact, the Defendants knew, or were reckless in not knowing, they would have to close the transaction, including Plaintiff's $7.4 million, in order to meet looming debt obligations—regardless of the level of total SAFE commitments that the Defendants had repeatedly assured Plaintiff the Company would have.

80.     During an early September 2021 call with Holmes, Holmes advised Sawyer that the SPAC was unlikely.  In light of this, Sawyer underscored more urgently that Plaintiff was interested in a SAFE investment solely if the Defendants could provide reasonable assurance that the Company had sufficient capital to operate until a sale, and what amount of capital that was. Holmes again stated that $50 million would be sufficient, and expected that, even absent the SPAC, the Company would be sold before the end of the second quarter of 2022, and possibly as early as year-end 2021.  Holmes lacked any reasonable basis to make these statements, given the Company's existing debt defaults, looming additional defaults, cratering revenues and EBITDA, and mounting obligations. These statements were therefore knowingly false when made.  The assurance of an imminent sale was reiterated to Plaintiff numerous times during communications with the Defendants and was a basis to induce Plaintiff to invest in the SAFE even if the SPAC was not consummated.

81.     In further support of their new story that the Company would be acquired through a private sale, on or about September 2, 2021, Holmes e-mailed Sawyer (with a copy to Whitcomb) a spreadsheet entitled "M&A Analysis" indicating potential values if the Company were acquired by any of four different, well-known, cannabis companies.  For the most part, the scenarios envisioned an acquisition value between $1.5 and $2.0 billion, premised upon the projected revenue and EBITDA contemporaneously disclosed to Plaintiff.  Although the Company indicated

the spreadsheet was illustrative, it was part and parcel of the broader misrepresentations that the Company was performing in line with projections and therefore had a reasonable expectation of being acquired at a value greatly exceeding the Company's debt.  Indeed, Holmes and Whitcomb were also representing to Sawyer around this time that they had received unsolicited offers from major cannabis companies to purchase the Company.

82.    On September 13, 2021, Holmes sent an e-mail to Sawyer and Whitcomb stating to Sawyer, "I wanted to circle back and see how things are progressing here as we are looking to lock in allocations."  Plainly, Holmes was anxious to get his hands on Plaintiff's funds.  That same day, Sawyer responded by e-mail advising that Plaintiff would be investing $7.5 million, though the final number wound up being $7.4 million.

83.    Later that day, in reliance on the representations made by Defendants, Plaintiff transmitted a signed version of the SAFE Agreement to the Defendants to be held in escrow.

### D.    Defendants Improperly Remove Plaintiff's Monies from Escrow

84.    Based on assurances Sawyer received from Holmes and Whitcomb, it was Plaintiff's understanding that the signature pages and the invested funds would not be released from escrow until such time as the Company actually received the promised $50 million from all investors.  These assurances were also false and misleading because, regardless of whether or not it reached the $50 million investment that the Company had promised to Plaintiff, the Company intended to close the SAFE investment in order to access the Plaintiff's money to keep the Company afloat.

85.    Upon information and belief, in late September 2021, Defendants withdrew Plaintiff's $7.4 million from escrow.  In particular, it was the Defendants' misrepresentations that the preconditions for releasing Plaintiff's signatures from escrow and closing its $7.4 million investment—*i.e.*, the remaining SAFE investment totaled at least $50 million—that induced

Plaintiff to execute the SAFE and to deposit the funds in the first instance.  Even setting aside the Defendants' other misrepresentations and omissions, withdrawing Plaintiff's $7.4 million without first achieving the $50 million in funding as promised entitles Plaintiff to rescission of the September 13, 2021 SAFE Agreement and return of the  $7.4 million investment plus interest.

86.     Approximately one month after the Defendants improperly removed the $7.4 million from escrow, on or about October 19, 2021, Sawyer e-mailed Holmes to inquire as to the status of the investment including what to expect in the way of reporting from the Company.  Later that day, Holmes e-mailed Sawyer advising, "[w]e will resume normal reporting."  Plaintiff never received any written financials or other quarterly information thereafter. Instead, during a November 1, 2021 Zoom call between Holmes and Sawyer, Holmes advised that everything was going as planned and the Company had plenty of cash to operate.  Holmes also stated  that there was significant interest in a potential sale of all or part of the Company or other business combination transaction and potential capital raise transactions; and that a Strategic Alternatives Committee comprised of the Company's Board of Directors was evaluating the potential options with the assistance of Perella Weinberg Partners as financial advisor and Mayer Brown as legal advisor.  This messaging was reiterated in a November 4 e-mail from the Company.  Significantly, there was no mention that the Company was in default.

## III.    THE SAFE AGREEMENT ALSO CONTAINED MISREPRESENTATIONS

87.     SAFE stands for "Simple Agreement for Future Equity."  A SAFE is a relatively new type of security under which, depending upon the terms of the individual instrument, an investor's cash investment generally converts to equity in the issuing company under conditions specified in the SAFE.  They are often issued to provide a company with bridge financing until it can complete an additional capital raise or sale of the company, and will often convert to equity upon the occurrence of that future, specified event.

88.    Plaintiff entered into the SAFE Agreement with SH Parent (i.e., the Company), which was executed on or about September 13, 2021.  Whitcomb executed the SAFE on behalf of SH Parent in his capacities as its Chief Development Officer and Secretary.

E.    **The Conversion Terms**

89.    The SAFE Agreement provided that it would convert to equity upon the occurrence of certain specified events:

(a)    First, the SAFE would convert to shares of certain preferred stock, referred to in the SAFE as SAFE Preferred Stock, upon an Equity Financing (as defined in the SAFE) of at least $10 million. SAFE ¶ 1(a);

(b)    Second, the SAFE would convert to shares of Series EE Preferred Stock, upon a Liquidity Event, which the SAFE defined as a change in control of SH Parent, or the closing of the SPAC transaction.  *Id.* ¶ 1(b);

(c)    Third, the SAFE would convert to shares of Series EE Preferred stock upon a Dissolution Event, which the SAFE defined as including termination of the Company's operations, assignment of its assets to creditors, or its liquidation.  *Id*. ¶ 1(c); and

(d)    Finally, the SAFE Agreement provided that, if none of the foregoing events had occurred by December 31, 2021, the SAFE would (after obtaining certain approvals and authorizations) "automatically and immediately convert into the number of shares of Series EE Preferred Stock equal to the Deemed Series EE Purchase Amount divided by the Series EE Preferred Stock Price." *Id*. ¶ 1(d).

F.    **The SAFE's Ineffective Attempts to Disclaim Liability**

90.    The SAFE Agreement also contains certain provisions that purport to limit the liability of SH Parent and its officers and directors.  For instance, the SAFE Agreement represents

that the investor "has had an opportunity to ask questions of and receive answers from representatives of the Company concerning the investment in this [SAFE] and the securities to be acquired by the Investor hereunder." *Id*. ¶ 4(c).  As detailed herein, although Plaintiff may have had the opportunity to ask questions, the Defendants failed to provide truthful, complete, non-fraudulent answers.

91.     Although Plaintiff noted its "knowledge and experience in financial and business matters," *id*., and that it had attempted to conduct responsible and adequate due diligence before investing, *id*., any investor, regardless of sophistication, would be thwarted in its efforts to conduct sufficient diligence when met with misleading and fraudulent misrepresentations and omissions.

92.     Similarly, the generic, blanket provision that "no representations or warranties have been made to the Investor other than pursuant to Section 3 [of the SAFE Agreement] and that the Investor has not relied upon any representation or warranty in making or confirming [its] investment other than pursuant to Section 3," *id*. ¶ 4(c), is ineffective, and cannot relieve the Defendants of their basic legal (not to mention ethical) responsibilities to provide true and complete information and disclosures.  Notably, the SAFE expressly provides that Plaintiff "acknowledges that it is not relying upon any person, other than the Company and its officers and directors, in making its investment or decision to invest in the Company." *Id*. ¶ 4(e).

### G.     The SAFE Agreement Included Incomplete and Misleading Risk Factors

93.     The SAFE Agreement also included a list of general warnings, most of which concerned the Company's business operations, rather than the Company's capital structure. Regardless, none of these could have sufficiently apprised Plaintiff that the Company would simply misrepresent its finances, including by omitting that it was in default on, and just days away (i.e., by September 30, 2021) from incurring additional significant defaults on, at least $300 million in debt obligations, which if honestly revealed would have stopped Plaintiff from investing $7.4

million in the SAFE.  Indeed, the Company misleadingly warned that there could be "no assurance" that additional financing "will be available to the Company or [the post-SPAC the Company entity], as applicable, on favorable terms or at all," without disclosing that its ability to obtain financing had evaporated along with myriad existing and/or imminent defaults on the vast majority of its debt obligations.  The foregoing warning was, in other words, at best a misleading and impermissible half-truth.

94.      Similarly, the Company's "warning" that "[t]he Company's debt could have important consequences to the Company" and that the Company's debt could cause numerous operational difficulties, was incomplete and misleading because it failed to address not only that the Company had already defaulted on its Senior and Junior Notes by issuing the PE Fund Note, but that, come September 30, 2021, the Company was going to pile more defaults on top of those based on its poor performance, dooming the Company into being at the mercy of their secured lenders.  The notion that the Company's debt "could have important consequences" for the Company was starkly misleading because that day had already arrived.

95.      The risks and problems that the Company warned about in general terms had already materialized in the specific form of serious debt defaults on the vast majority of the Company's outstanding debt obligations, and such warnings were therefore fraudulent and misleading.

## IV.    JUST DAYS AFTER PLAINTIFF FUNDED THE SAFE, PARALLEL INCURRED NUMEROUS ADDITIONAL DEBT DEFAULTS ON $300 MILLION OF SENIOR AND JUNIOR NOTES

96.      On September 30, 2021—just days after Plaintiff funded its $7.4 million investment—the Company incurred further defaults on the Senior and Junior Notes, which comprise approximately $300 million in debt obligations, and comprise the vast majority of the Company's outstanding debt.  The Company thus knew, but did not disclose, that based on its

actual financial performance during the diligence period, it was about to incur numerous additional defaults on its outstanding obligations, and therefore failed to disclose material information necessary to, among other things, make statements about the sufficiency of the Company's funding and capital, and the warning language in the SAFE Agreement, not misleading.  Upon information and belief, the individual Defendants in their high-level roles at the Company were aware of these covenants and defaults.

97.     On November 29, 2021, PE Fund—which indisputably was the cause of one of the Company's defaults under the Senior and Junior Notes—in its capacity as the "Required Holder" for the Senior Notes, notified the Company that, as of September 30, 2021, the Company had defaulted on certain covenant obligations under the Senior Notes.  Specifically, PE Fund notified the Company that it had failed to deliver to the lenders under the Senior Notes the Company's financial statements for the quarter ended September 30, 2021, and failed to notify the Senior Note holders that it defaulted on this obligation.  Upon information and belief, including the Company's and its executives' knowledge of its obligations under the Senior and Junior Notes and the timing of those obligations, the Company was aware as of September 20, 2021—the date the Plaintiff funded its $7.4 million SAFE investment—that the Company would incur this default on September 30, 2021.

98.     Upon information and belief, on December 16, 2021, the Company received an even more alarming default notice—this time for the Junior Note—in the form of a Notice of Default, Election of Default Rate and Reservation of Rights to the Company (the "Junior Lien Notice") from Talladega LP, the Administrative Agent and Collateral Agent for the Junior Note holders.  The Junior Lien Notice informed the Company that it had failed to: (i) maintain the

required debt-service-coverage ratio; (ii) maintain specified adjusted consolidated EBITDA as of September 30, 2021; and (iii) "pay Catch-Up [a]mount[s]" due as of September 30, 2021.

99.     The Junior Lien Notice also explained that the Company had defaulted on the Junior Note through its "incurrence of Indebtedness pursuant to that certain Negotiable Subordinated Promissory Note dated June 30, 2021"—*i.e.*, the PE Fund Note.   Section 9.11 of the NPA incorporates these Junior Note covenants as equal protections for the Senior Notes, so the Company's defaults under the Junior Note constituted Events of Default under the Senior Notes. Upon information and belief, including the Company's knowledge of its obligations under the Senior and Junior Notes and the timing of those obligations, and the Company's knowledge that it had incurred the obligations under the PE Fund Note (and had not disclosed the effect of those obligations to investors), the Company was aware as of September 20, 2021—the date Plaintiff funded its $7.4 million SAFE investment—that the Company would incur these defaults just days later.

100.    Further, although the foregoing default notices did not raise the issue, as of September 20, 2021 (the date that Plaintiff wired the $7.4 million to the Company), the Company also knew that its forbearance agreement with Green Health would expire 30 days after September 30, 2021—and that the Company had no way to meet an obligation to pay Green Health $44.3 million (now $54 million with accrued interest) by November 1, 2021.   To the contrary, the Defendants had disclosed that the Green Health Notes would have converted into equity by the time the SAFE funding had closed—which was false.

101.    Notably, on October 1, 2021, the Company sent an e-mail, on behalf of Wrigley, to the Company's investors explaining that the Company was no longer pursuing the SPAC transaction.   Among other things, he noted that the Company would "focus on alternative financing

avenues to pursue a vast array of growth opportunities," and that, the Company had "just raised and closed a significant initial equity financing through the private markets," referring to the SAFE.

102.     What this e-mail omitted was Wrigley's extreme resistance—given his knowledge of the Company's dire finances—to put up any of his own funds to support the SAFE.  As part of the SAFE negotiations, Sawyer conveyed to Holmes and Whitcomb that it was important to Plaintiff that Wrigley be invested in the SAFE.  Holmes and Whitcomb represented that Wrigley would agree to commit $5 million. But, as it turns out, Wrigley had not invested anything in the SAFE at the time that Plaintiff's $7.4 million was withdrawn from escrow.  Moreover, Defendants had closed the SAFE and removed Plaintiff's money from escrow despite failing to reach the $50 million investment that they promised they would reach before withdrawing Plaintiff's $7.4 million.

103.     Upon information and belief, Wrigley finally invested his own personal funds in late November 2021, though now he had to contribute $10.5 million to make up for the shortfall from the previously-promised $50 million.  This fact further shows that in late September the SAFE was never fully subscribed—and certainly not over-subscribed—as represented by the Defendants.  But even after contributing $10.5 million, Wrigley failed actually to maintain even that level of investment commitment to the SAFE.  Upon information and belief, the Company had used $3 million of the SAFE proceeds to make a payment back to Wrigley under the PE Fund Note.  In other words, Wrigley invested $10.5 million in the Company from one pocket (to artificially make it appear there was $50 million raised), but had taken $3 million back to put in another pocket.  Consequently, even with Wrigley's post-closing SAFE advance, the Company

never had $50 million in capital to bridge to the end of the second quarter 2022, because $3 million of what Wrigley paid was transferred to an entity that he controlled, for his own benefit.

**DEFENDANTS' MISREPRESENTATIONS FINALLY COME TO LIGHT**

**V.     PARALLEL REVEALS NUMEROUS DEBT DEFAULTS ON AT LEAST $300 MILLION IN OUTSTANDING DEBT OBLIGATIONS AND THE DIRE STATE OF ITS CAPITAL NEEDS**

104.    On December 1, 2021—approximately two months after Plaintiff entered the SAFE Agreement and funded its $7.4 million SAFE investment—the Company revealed more previously undisclosed facts that completely altered the landscape of the investment.

105.    Upon information and belief, during a Zoom call that day between representatives of TradeInvest Asset Management Company ("TradeInvest")[4] and Perella Weinberg Partners ("PWP")—one of the Company's financial advisors in connection with the purported effort to sell the Company—PWP disclosed that the year-end interest payment due on the $165 million in Senior Notes would not be paid, because the Company would instead need to conserve precious cash for the sale process.

106.    This same disclosure also made clear that, contrary to the Company's repeated portrayals, the funds raised through the SAFE would not last the Company even through the end of the second quarter of 2022.  Indeed, it would not last the Company through the end of 2021. The Defendants, with full knowledge of the Company's own capital structure, with exclusive knowledge of the internal finances, and knowing the truth behind their diminishing revenue and EBITDA prospects and projections, had no reasonable basis to claim that the SAFE would last the

---

[4] On or about March 8, 2022, TradeInvest and other plaintiffs commenced a similar fraud lawsuit against the Defendants and others for, *inter alia*, securities fraud arising out of their $25 million SAFE investment (the "TradeInvest Lawsuit").  That case (No. 22-CV-80360-AMC) is currently pending in this Court.

Company through the end of the second quarter of 2022, and indeed knew (or were reckless in not knowing) it could not.

107.     Upon information and belief, during the same call, PWP disclosed for the first time the various debt defaults enumerated above—including the issuance of the PE Fund Note (as of June 2021), and the various defaults that happened on September 30, 2021 (just days after Plaintiff was induced to provide the Company with $7.4 million).

108.     On or about January 17, 2022, Sawyer learned from Holmes that Wrigley and Holmes were no longer employed by the Company.  On January 19, 2022, the Company's Deputy General Counsel Courtney Stough advised Sawyer to speak with Whitcomb who was the Company's new CEO.

109.     On or about January 20, 2022, Sawyer had a Zoom call with Whitcomb.  Whitcomb informed Sawyer of the Company's financial problems including the various defaults.  Whitcomb stated unequivocally that Wrigley grossly mismanaged the Company by being missing-in-action, and was forced to resign by Whitcomb.  Whitcomb advised that Wrigley created the situation where the Company was close to running out of money on various occasions, and then Wrigley would rescue the Company by offering to lend money at high rates of interest in an effort to enrich himself.  Whitcomb also stated that Wrigley wasted a lot of money by hiring large numbers of unnecessary white collar professionals which led to excessive cash burn.  Whitcomb further conceded during the same call that Wrigley initially failed to fund his SAFE commitment, yet had taken Plaintiff's $7.4 million without reaching the agreed-upon $50 million.

110.     Only after Sawyer's January 20, 2022 call with Whitcomb was Plaintiff granted access to PWP's data room for the very first time.  One of the documents titled "Capital Structure and Waterfall Information," was obviously important to investors given the (now disclosed) state

of free fall debt defaults.  Unlike the projections provided to Plaintiff to induce the SAFE Agreement and investment which made no mention of the Green Health Notes, the PWP data room showed that the Green Health Notes were still outstanding.  Plaintiff would not have executed the SAFE and advanced funds to be converted into equity had it known that equity would be repaid in liquidation behind the Green Health Notes.  However, the Company had previously advised that the Green Health Notes could convert into equity prior to (and thus be junior to) the SAFE investment's conversion.

## VI.   PARALLEL REVEALS THE SAFE FUNDS WERE USED TO PAY OTHER INVESTORS, INCLUDING PE FUND

111.    On January 24, 2022, the PWP data room was updated with another revealing chart:

| Cash Flow Bridge ($ in Millions) | | Strictly Private & Confidential 1/24/2022 |
|---|---|---|
| Item | Amount | Note |
| Cash Balance as of 6/30/2021 | $47 | Per Company |
| Proceeds from SAFE Note | 50 | |
| Interest on Senior Notes | (4.1) | |
| Interest on SAF Notes | (5.7) | Includes October catch-up interest |
| Amortization of SAF Notes | (2.5) | Principal |
| Catch Up Payments / Fees on SAF Note | (6.0) | 2M catch up principal in October + 4M fees in Q4 |
| Amortization of PE Promissory Notes | (3.0) | Principal |
| Van Dyk Loan | (0.2) | Principal & interest |
| Professional Fees | (12.1) | Irregular & non-recurring items |
| Net Capex Payments | (18.1) | |
| Rent | (19.4) | Includes SLB |
| Operating Cash Flow | 1.6 | |
| Ending Cash Balance on 12/30/2021 | $27 | Per TWCF dated 1.7.22 |

112.    The Company yet again revealed another set of astounding misrepresentations.  The Defendants, through PWP and the above chart, admitted that the Company used the proceeds from the SAFE to fund outstanding debt obligations, as opposed to using it to fund the capital and operating expenses that Defendants had all along represented it was to be used for.

113.    The same chart even revealed that the Company had used at least $3 million of the SAFE proceeds to pay down the obligation under the PE Fund Note, meaning Wrigley actually paid $3 million of his own SAFE commitment back to himself no more than two months later.

## VII. PLAINTIFF SOUGHT RESCISSION PRIOR TO FILING SUIT, BUT THE DEFENDANTS REFUSE TO RETURN THE $7.4 MILLION

114.    On or about August 10, 2022, Plaintiff sent a letter to the Company proposing to tender the shares to the Company in exchange for the return of its $7.4 million investment plus applicable interest, costs and fees.  Over 30 days have elapsed and the Company has ignored this request.

### JUSTIFIABLE RELIANCE

115.    Plaintiff believed and relied upon the false and misleading representations described above when entering into the SAFE Agreement and making its investment.  But for the material misrepresentations and omissions (all of which occurred via e-mails or telephone/Zoom calls involving interstate commerce) committed by the Defendants concerning the Company's capital structure, finances, level of SAFE investment, that the SAFE investment would bridge the Company's capital needs until the end of the second quarter of 2022, and the intended use of the SAFE proceeds, Plaintiff would not have agreed to enter into the SAFE.

116.    Plaintiff reasonably and justifiably relied upon these material misrepresentations and omissions about the Company and the SAFE.  As officers of the Company, Wrigley, Holmes, and Whitcomb were uniquely situated to know and understand the full picture of the Company's finances and prospects, as well as how much had been raised for the SAFE and how the Company would use those proceeds.   Nonetheless, the Defendants deliberately made the material misrepresentations and omissions detailed above.  Plaintiff, by contrast, were not in a position to know the non-public, undisclosed information about the Company's obligations, including existing, undisclosed debt defaults.

## SUMMARY OF SCIENTER ALLEGATIONS

117.  It is clear from the foregoing allegations that the Defendants via interstate commerce made numerous misrepresentations and omissions about the Company, its capital structure, and the SAFE Agreement and investment, while in possession of material, undisclosed facts that were contrary to their representations, or necessary to make their representations complete and not misleading.  The Defendants therefore made these alleged misstatements knowingly and intentionally to induce Plaintiff to provide $7.4 million for the SAFE, and intended that Plaintiff rely on them.  The statements by the executives of the Company and on its behalf were either made either with actual knowledge of their falsity, or under circumstances where the Defendants should have known of their falsity.

118.  The Defendants had both motive and opportunity to deceive Plaintiff.  The Defendants were engaged in a Ponzi-like scheme to solicit new investors to keep the Company from collapsing under the weight of its debt.  As officers of the Company, they stood to gain from successfully raising tens of millions of dollars with the SAFE, particularly because the SAFE required no expenditure in interest or repaid principal on the part of the Company.  Further, Wrigley in particular stood to gain because the SAFE could help alleviate the burdens on the Company so that the obligations to his personal investment vehicles—Green Health and PE Fund—could be satisfied.  And the Cash Flow Bridge chart above shows that the SAFE proceeds were used to pay at least $3 million to PE Fund—which benefited Wrigley personally.  Indeed, this also means that, even though Wrigley purported to invest $10.5 million in the SAFE, he took $3 million back almost immediately thus decreasing his exposure in this suspect investment.

## LOSS CAUSATION

119.  Plaintiff has been deprived of, and lost, at least $7.4 million in connection with the SAFE.  In particular, Defendants' misrepresentations and omissions caused Plaintiff to execute the

SAFE and commit $7.4 million to the SAFE, which they would not have committed had Plaintiff known the truth that was revealed shortly afterward.

120.     Furthermore, it was Defendants' misrepresentations and omissions that caused Plaintiff's losses, because absent those misrepresentations and omissions, Plaintiff would still be in possession of the $7.4 million of which it was deprived.

121.     Plaintiff has been required to retain undersigned counsel to represent its interests in this matter and has agreed to pay counsel a reasonable fee.

**FIRST CAUSE OF ACTION**
**For Violations of §10(b) of the Exchange Act and Rule 10b-5**
**(Against All Defendants)**

122.     Plaintiff repeats and realleges the allegations in Paragraphs 1- 121  as if fully set forth herein.

123.     Plaintiff brings this cause of action against the Defendants for violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

124.      Between August and September 2021, inclusive, the Defendants made the various false and materially misleading statements specified above via interstate commerce, which they knew or recklessly disregarded were false and misleading because they misrepresented or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

125.     The Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff related to the SAFE.

126.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff suffered damages in connection with the SAFE.  In reliance on the Defendants' misstatements and omissions, Plaintiff executed the SAFE Agreement and committed $7.4 million to the SAFE. Plaintiff would not have provided those funds for the SAFE if it had been aware of the misstatements and omissions made by the Defendants.  Plaintiff did not know, and could not in the exercise of reasonable diligence have known, of the Defendants' misrepresentations and omissions.  These same misrepresentations and omissions caused the Plaintiff's losses.

127.    By virtue of the conduct alleged herein, the Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiff for damages in an amount to be determined at trial, but not less than $7.4 million plus interest.

<u>**SECOND CAUSE OF ACTION**</u>
**For Violations of Section 20(a) of the Exchange Act**
**(Against Wrigley, Holmes, and Whitcomb)**

128.    Plaintiff repeats and realleges the allegations in Paragraphs 1- 127  as if fully set forth herein.

129.    Plaintiff brings this cause of action against Wrigley, Holmes, and Whitcomb for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78(a).

130.    In their positions as officers and directors of the Company, Wrigley, Holmes, and Whitcomb were controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of the Company, Wrigley, Holmes, and Whitcomb had the power and authority to cause the Company to engage in the conduct complained of herein.  Their level of control is also evidenced by their active roles in making the decisions and entering contracts on behalf of the Company discussed above. These Defendants were able to—and did—control, directly and indirectly, the decision-

making of the Company, including the misstatements and omissions made by and on behalf of the Company via interstate commerce.

131.    Furthermore, Wrigley, Holmes, and Whitcomb, as alleged above, had significant day-to-day involvement in the operations of the Company and in particular the transactions at issue here, and are therefore culpable participants in the alleged misconduct.  They participated in calls, written communications, and other aspects of the transactions that were responsible for inducing Plaintiff to enter the SAFE Agreement and invest $7.4 million in the SAFE.

132.    As a result, Wrigley, Holmes, and Whitcomb were control persons of the Company within the meaning of Section 20(a) of the Exchange Act.

133.    The Company committed violations of Section 10(b) of the Exchange Act.

134.    By reason of the foregoing, Wrigley, Holmes, and Whitcomb violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78(a), and are liable to Plaintiff.

**THIRD CAUSE OF ACTION**
**For violation of Georgia Uniform Securities Act of 2008 (Blue Sky Laws)**
**Ga. Code Ann., § 10-5-58**
**(Against All Defendants)**

135.    Plaintiff repeats and realleges the allegations in Paragraphs 1- 134 as if fully set forth herein.

136.    Upon information and belief, the Defendants negotiated significant portions of the SAFE investment within, from, and/or directed into the state of Georgia, and executed the SAFE in Georgia, as evidenced by, among other things, the address under Whitcomb's signature on the SAFE itself, which is in Atlanta, Georgia.  The Defendants were therefore subject to, and required to comply with, the requirements of the Georgia Uniform Securities Act of 2008.

137.    Plaintiff brings this cause of action under Section 10-5-58 of the Georgia Code against the Defendants.  Plaintiff is not required under this cause of action to allege that the

40

Defendants acted with scienter or fraudulent intent, as these are not elements of a claim under Section 10-5-58(c).

138.    During discussions concerning the SAFE, the Defendants made the false and materially misleading statements specified above, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

139.    The Defendants did not disclose the concealed information described above to Plaintiff.  Rather, Plaintiff first learned that information beginning in January 2022, approximately four months after executing the SAFE Agreement and providing its SAFE investment to the Defendants.  Plaintiff did not know, and could not in the exercise of reasonable diligence have known, of the Defendants' misrepresentations and omissions.

140.     But for the Defendants' misrepresentations and omissions, Plaintiff would not have invested in the SAFE.  As a direct and proximate result of the Defendants' wrongful conduct, upon which Plaintiff did rely, Plaintiff has suffered damages in connection with the SAFE.

141.    By virtue of the conduct alleged herein, the Defendants have each violated § 10-5-58 of the Georgia Uniform Securities Act of 2008, and are liable to Plaintiff for damages in an amount to be determined at trial, but not less than $7.4 million.  Plaintiff is also entitled to rescission of the SAFE investment, along with interest, expenses, fees, and costs associated with the investment and recovery thereon.

### FOURTH CAUSE OF ACTION
**For Violation of Georgia Uniform Securities Act of 2008 (Blue Sky Laws)**
**Ga. Code Ann., § 10-5-58(g)**
**(Against Wrigley, Holmes, and Whitcomb)**

142.    Plaintiff repeats and realleges the allegations in Paragraphs 1- 141 as if fully set forth herein.

143.     Plaintiff brings this cause of action pursuant to Section 10-5-58(g) of the Georgia Code against Wrigley, Holmes, and Whitcomb.  Plaintiff is not required to allege that Wrigley, Holmes, and Whitcomb acted with scienter or fraudulent intent.

144.     As directors, executive officers, and/or "persons" who directly or indirectly control the Company, Wrigley, Holmes, and Whitcomb are liable jointly and severally with and to the same extent as the Company under Section 10-5-58(g) of the Georgia Code.

145.     By reason of their positions of control and authority as officers and/or directors of the Company, Wrigley, Holmes, and Whitcomb had the power and authority to cause the Company to engage in the conduct complained of herein.  These Defendants were able to, and did, control, directly and indirectly, the decision-making of the Company, including the statements made to the representatives of Plaintiff.

146.     Wrigley, Holmes, and Whitcomb, in their capacities as officers and/or directors of the Company, participated in and materially aided the misstatements and omissions set forth above. Wrigley, Holmes, and Whitcomb had direct and supervisory involvement in the SAFE investment and in procuring funds related thereto, and had the ability to influence and direct and did so influence and direct the activities of the Company in its violations of Section 58 of the Georgia Uniform Securities Act of 2008.

147.     As set forth above, the Defendants violated Section 58 of the Georgia Uniform Securities Act of 2008.  By virtue of their positions as controlling persons, executive officers and directors, and as a result of their aforesaid conduct and culpable participation, Wrigley, Holmes, and Whitcomb are liable pursuant to Section 58(g) of the Georgia Uniform Securities Act of 2008, jointly and severally with, and to the same extent as the Company is to Plaintiff.

148.    By reason of the foregoing, Wrigley, Holmes, and Whitcomb violated Section 58(g) of the Georgia Uniform Securities Act of 2008, Georgia Code § 10-5-58(g), and are liable to Plaintiff.

### FIFTH CAUSE OF ACTION
**For Common Law Fraud / Fraudulent Inducement**
**(Against All Defendants)**

149.    Plaintiff repeats and realleges the allegations in Paragraphs 1- 148 as if fully set forth herein.

150.    Each of the Defendants made, authorized, or caused the misrepresentations or omissions at issue, which are summarized above.

151.     The misrepresentations and omissions set forth above were fraudulent and material.

152.    Each of the Defendants knew or recklessly disregarded that their representations and omissions were false and/or misleading at the time they were made.  Each of the Defendants made the misleading statements with an intent to defraud Plaintiff, as detailed above.

153.    The Defendants had reason to expect that Plaintiff would rely on such representations and intended that their misleading statements and omissions would fraudulently induce Plaintiff to both enter into the SAFE Agreement and invest $7.4 million in the SAFE.

154.    Plaintiff justifiably relied on the Defendants' misrepresentations and omissions, as detailed above.  Plaintiff did not know, and could not in the exercise of reasonable diligence have known, of the Defendants' misrepresentations and omissions.

155.    Had Plaintiff known the facts regarding the SAFE and the Company, it would not have invested in the SAFE.

156.     As a direct and proximate result of the Defendants' false representations and omissions, Plaintiff has suffered damages in an amount to be proven at trial, but no less than $7.4 million plus interest.

### SIXTH CAUSE OF ACTION
**Rescission**
**(Against the Company)**

157.     Plaintiff repeats and realleges the allegations in Paragraphs 1- 156  as if fully set forth herein.

158.     Defendants made knowingly false representations to Plaintiff when they advised, *inter alia*, that (i) Plaintiff's $7.4 million would not be withdrawn from escrow until a total of $50 million in investments had been received by the Company, including at least $5 million from Defendant Wrigley; and (ii) the investment would be used to fund future capital expenditures, when in fact the money was used to satisfy outstanding and future debt defaults.

159.     Defendants' misrepresentations were made with the intent of inducing Plaintiff to act in reliance on the deliberate misrepresentations.

160.     Plaintiff justifiably relied on Defendants' misrepresentations, to its detriment.

161.     Plaintiff has offered to tender the shares in exchange for the return of its $7.4 million investment plus interest at a legal rate from the date of purchase, plus all costs and reasonable attorneys' fees as permitted under applicable law.

162.     Defendants have ignored this request.

163.     Plaintiff has been damaged in an amount of at least $7.4 million plus interest, costs, fees and expenses.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

164.    An award in favor of Plaintiff against the Defendants, jointly and severally, in an amount to be proven at trial, but no less than $7.4 million; and/or rescission of Plaintiff's SAFE investments together with interest, fees, costs, and expenses, and such other and further relief as the Court may deem just and proper; and

165.    All other relief in favor of Plaintiff and against Defendants that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

NASON YEAGER GERSON HARRIS & FUMERO, P.A.

By: /s/ Gary A. Woodfield
  Gary A. Woodfield
  3001 PGA Blvd., Suite 305
  Palm Beach Gardens, Florida  33410
  (561) 686-3307
  gwoodfield@nasonyeager.com

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.

By: /s/ John F. Sylvia
  John F. Sylvia (*pro hac vice* to be filed)
  One Financial Center
  Boston, MA 02111
  (617) 542-6000
  *Attorneys for Plaintiff Legacy Knight Strategic Opportunities Fund – Parallel Series*