UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 22-81569-CIV-CANNON/Reinhart

LEGACY KNIGHT STRATEGIC
OPPORTUNITIES FUND-PARALLEL
SERIES,

        Plaintiff,

v.

WILLIAM BEAU WRIGLEY JR et al.,

        Defendants.

_____/

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS

THIS CAUSE comes before the Court upon Defendants' Combined Motion to Dismiss Plaintiff's Complaint (the "Motion") [ECF No. 38]. The Court has reviewed the Motion, Plaintiff's Opposition [ECF No. 40], Defendants' Reply [ECF No. 41], and the full record. For the reasons set forth below, the Motion [ECF No. 38] is **DENIED**.

## RELEVANT BACKGROUND

The following facts are drawn from the Complaint [ECF No. 1] and accepted as true for purposes of this Order.

Plaintiff's claims relate to its interactions with Defendants in negotiating a $7.4 million investment into a Simple Agreement for Future Equity Investment (hereinafter "SAFE Investment"), yet the story of this case begins far before the SAFE Investment was ever marketed. Defendant Parallel operates as a holding company focused on "the development, production, and sale of cannabis products, oils, and extracts through subsidiaries" [ECF No. 1 ¶ 19]. Defendant Parallel is owned by Defendant Surterra Holdings, Inc. (together "the Company") [ECF No. 1

CASE NO. 22-81569-CIV-CANNON/Reinhart

¶ 20].[1]  The other Defendants hold various roles within the Company.  Defendant William Wrigley invested in the Company in 2017 and eventually assumed control of the day-to-day operations when he became Chairman and CEO in late 2018, a position he held until November 19, 2021 [ECF No. 1 ¶ 23].  Defendant James Holmes worked as a director at Parallel from September 2017 through November 2021, where he also assumed the role of Chief Strategy Officer from January 2019 through December 2021 [ECF No. 1 ¶ 24].  Defendant James Whitcomb held a role as the Company's Chief Development Officer until November 19, 2021, when he assumed his present role as CEO of the Company [ECF No. 1 ¶ 25].

**The Company's Debt Obligations**

The Company began incurring debt obligations in late 2018, when Wrigley became CEO [ECF No. 1 ¶ 29].  The first notes into which the Company entered are referred to as "the Senior Notes" and consist of $165.5 million in aggregate 10% Senior Notes, which accrue interest and have the potential to incur pre-payment penalties [ECF No. 1 ¶ 30].  These notes are governed by a Note Purchase Agreement dated October 16, 2018, and are secured by first priority liens on and security interests in all the assets of the Company, as well as its direct and indirect subsidiaries [ECF No. 1 ¶¶ 31–32].

The Company took on another large debt obligation on May 7, 2021, when it entered into the Junior Note with SAF Group, an "alternative investment management firm based in Canada" [ECF No. 1 ¶ 36].  The Junior Note consists of $145 million of junior secured debt, subject to interest and a potential for pre-payment penalties [ECF No. 1 ¶ 36].

The Company is obligated on other debt obligations, including the Green Health Notes, which had a May 1, 2021, maturity date [ECF No. 1 ¶ 38].  The Green Health Notes consist of a

---

[1] The Company's invested capital consists of $67 million in SAFE securities, $79 million in aggregate Series E Preferred Stock, $166 million in aggregate Series D Preferred Stock, and other preferred and common stock [ECF No. 1 ¶ 61].

CASE NO. 22-81569-CIV-CANNON/Reinhart

$54 million debt on $44.3 million in convertible secured notes, which accrue interest at a rate of 16% per year and carry a pre-payment penalty of 25% [ECF No. 1 ¶ 38]. These notes were negotiated during a time when Wrigley held positions as both Chairman and CEO of the Company and Chairman and CEO of Green Health [ECF No. 1 ¶ 39]. Holmes was also involved in the transaction to negotiate the Green Health Notes, representing Green Health, while simultaneously serving as director and Chief Strategy Officer for the Company [ECF No. 1 ¶ 41]. The terms of the Green Health Notes allow the notes to "convert into preferred equity of the Company" at a rate of 2.5 times their value, "such that Green Health's actual contribution of $44.3 million . . . would be magnified into a shocking $135 million, and would convert into that amount of preferred stock" [ECF No. 1 ¶ 40]. These notes were renegotiated several times and were subject to a forbearance agreement in effect from May 7, 2021, to October 31, 2021 [ECF No. 1 ¶¶ 44–46].

On January 8, 2021, the Company incurred an additional debt to its former CEO, Robert "Jake" Bergmann, when it entered into an agreement to settle a dispute between Bergmann and the Company over the value of Bergmann's common stock (the "Bergmann Settlement") [ECF No. 1 ¶¶ 49–52]. The Bergmann Settlement required the Company to pay Bergmann $38.5 million, including an initial $6 million payment that was financed by a Green Health Note [ECF No. 1 ¶¶ 51–52].

In June 2021, the Company realized that it did not have the funds to make its second $13.5 million payment ($12.5 million plus a $1 million late fee) under the Bergmann Settlement, causing the Company to turn to PE Fund, LP ("PE Fund") for an advance [ECF No. 1 ¶ 54]. Wrigley's family office is the General Partner of PE Fund [ECF No. 1 ¶ 55]. This advance was executed as the "PE Fund Note," by which PE Fund advanced the Company $13.5 million to be repaid within six months, subject to a $2.5 million "transaction fee" and a 16% interest rate [ECF No. 1 ¶ 55].

The Company has various other debt obligations, including $107 million in consideration for a 2021 deal to acquire a cannabis dispensary, Windy City Cannabis [ECF No. 1 ¶ 59].  More broadly, beginning in late September 2021, the Company began to experience defaults on $300 million of outstanding debt, including "covenant and payment defaults on $145 million of recently-issued junior debt [,] cross-defaults on $165 million of senior debt [and] defaults on a $13.5 million promissory note" [ECF No. 1 ¶¶ 3–4].

## SAFE Negotiations

Plaintiff entered the picture in January 2021 [ECF No. 1 ¶ 62].  On January 20, 2021, Plaintiff was introduced to Wrigley and Holmes in connection with a potential private investment in a public equity (PIPE) transaction [ECF No. 1 ¶ 62].  Plaintiff eventually executed a PIPE subscription agreement on February 12, 2021 [ECF No. 1 ¶ 62].  A discussion of the SAFE Investment began in August 2021 [ECF No. 1 ¶ 63].  From that date until September 20, 2021, Plaintiff engaged in negotiations with Defendants about a $7.4 million investment in the SAFE Investment [ECF No. 1 ¶ 63].  On August 5, 2021, David Sawyer, Plaintiff's Chief Operating Officer and Managing Partner, took part in a Zoom call with Holmes and Wrigley during which Sawyer was told that the Company "was looking to raise between $30 and $50 million as part of a new SAFE security" that would serve as "'bridge' capital to fund the Company's capital projects and operating expenses" while the Company waited for its public merger through a special purpose acquisition company (SPAC) to close [ECF No. 1 ¶¶ 65–66].  Neither Holmes, Whitcomb, nor Wrigley informed Sawyer about the Company's existing and looming debt obligations [ECF No. 1 ¶ 64].

On August 10, 2021, Holmes emailed Sawyer (copying Wrigley and Whitcomb) a draft of the SAFE Agreement and a presentation entitled "August 2021 Company Overview: Parallel/Ceres Acquisition Corp. SPAC transaction" [ECF No. 1 ¶ 67].  The presentation outlined the SPAC and

provided information about "the Company, its capital structure, and its financing needs" [ECF No. 1 ¶ 68]. The presentation projected the Company's revenue for 2022 to be $618 million, with an adjusted EBITDA[2] of $167 million [ECF No. 1 ¶ 69]. Those revenues were adjusted down by 20% and 40% in October 2021 and again by 25% and 45% in January 2022 [ECF No. 1 ¶ 69]. On August 13, 2021, Holmes sent a follow-up email (again copying Wrigley and Whitcomb) in which he told Sawyer that Defendants have "$40m committed to the SAFE and are hoping to close in the next week or so" and would love to have Plaintiff participate [ECF No. 1 ¶ 70]. Sawyer responded on August 16, 2021, advising Holmes that Plaintiff was interested in participating in the SAFE Investment with an investment between $5 million and $10 million [ECF No. 1 ¶ 71]. The next day, August 17, 2021, Sawyer had a Zoom call with Holmes and Whitcomb, along with other Company executives [ECF No. 1 ¶ 71]. Sawyer had additional communications with Holmes, Whitcomb, and Wrigley where he was informed that the board of directors "had approved increasing the maximum proceeds of the SAFE because they had demand in excess of $50 million," but Defendants also note that the SPAC had a reduced value, which Defendants represented was positive "because the Company's stock would outperform expectations once it began trading" [ECF No. 1 ¶ 72].

On August 24, 2021, Holmes held a Zoom call with Sawyer during which he conceded that the SPAC may not be consummated [ECF No. 1 ¶ 73]. However, on that call, Holmes explained that "the SAFE funding would be sufficient to fund the Company—and specifically its capital and operating expenses—until a private sale could be consummated" [ECF No. 1 ¶ 73]. Defendants also reviewed their planned expenditures with Sawyer in "greater detail" after "Sawyer [] again sought assurance that the Company would not run out of funds before the sale process could be completed" [ECF No. 1 ¶ 74]. Holmes and Whitcomb responded that an additional $25–50 million

---

[2] EBITDA represents earnings before taxes, depreciation, and amortization.

may be needed to sustain the Company through the end of 2022 "after the $50 million SAFE investment had bridged the company through second quarter 2022" [ECF No. 1 ¶ 74]. Holmes and Whitcomb again told Sawyer that "the $50 million would increase the operating cash to over $100 million which would be more than sufficient to fund the Company's capital and operating expenses" [ECF No. 1 ¶ 75]. They then walked Sawyer through the Company's "supposed" capital expenditure plans, including "funding growth in Florida, opening a new store in Massachusetts and funding a Texas operation" [ECF No. 1 ¶ 75]. During that call, Sawyer again explained that "Plaintiff would commit funds to the SAFE only if Plaintiff was confident that (i) the Company had significant SAFE and PIPE commitments already in hand, and (ii) the funds raised in connection with the SAFE would be a sufficient bridge until the Company could be sold" [ECF No. 1 ¶ 76]. Sawyer also "sought assurances that sufficient funds would be invested in the SAFE by other investors alongside the Plaintiff's proposed $5–10 million commitment" [ECF No. 1 ¶ 76]. Holmes and Whitcomb, in response, told Sawyer that "the Company had more than $50 million in SAFE commitments *already in hand* and about $70–80 million in verbal commitments (including $5 million from Wrigley)" [ECF No. 1 ¶ 76 (emphasis in original)].

On August 25, 2021, Holmes sent Sawyer and Whitcomb an email with the Series E Stockholder's Agreement [ECF No. 1 ¶ 77]. On August 30, 2021, Holmes sent Sawyer another email (copying Whitcomb), which stated that they had received shareholder consent to move forward on a "first close" [ECF No. 1 ¶ 78]. Sawyer responded with a signed PIPE termination agreement [ECF No. 1 ¶ 78]. Whitcomb sent a separate email to Sawyer and Holmes that same day, stating that the SAFE Investment involved $50 million from "multiple investors" and that any paperwork signed prior to the close would be "held in escrow until close" [ECF No. 1 ¶ 79].

During an early September 2021 Zoom call, Holmes told Sawyer that the SPAC was unlikely to occur, leading Sawyer to "underscore[] more urgently that Plaintiff was interested in a

CASE NO. 22-81569-CIV-CANNON/Reinhart

SAFE investment solely if the Defendants could provide reasonable assurance that the Company had sufficient capital to operate until a sale, and what amount of capital that was" [ECF No. 1 ¶ 80].  Holmes reassured Sawyer that the $50 million would be sufficient and said that, even without the SPAC, "the Company would be sold before the end of the second quarter of 2022, and possibly as early as year-end 2021" [ECF No. 1 ¶ 80].

On September 2, 2021, Holmes emailed Sawyer (copying Whitcomb) a spreadsheet titled "M&A Analysis" indicating potential values for the Company should it be acquired by any of four well-known cannabis companies; all of those scenarios projected an acquisition value of between $1.5 and $2 billion [ECF No. 1 ¶ 81].  Holmes and Whitcomb also told Sawyer around this time that "they had received unsolicited offers from major cannabis companies to purchase the Company" [ECF No. 1 ¶ 81].

Holmes sent Sawyer an email (copying Whitcomb) on September 13, 2021, to check in and noted that the Company was "looking to lock in allocations" [ECF No. 1 ¶ 82].  Sawyer responded and advised that Plaintiff would be investing $7.5 million, though the ultimate contribution was $7.4 million [ECF No. 1 ¶ 82].

On September 13, 2021, "in reliance on the representations made by Defendants, Plaintiff transmitted a signed version of the SAFE Agreement to the Defendants to be held in escrow" [ECF No. 1 ¶ 83].  Whitcomb then executed the SAFE Agreement on behalf of the Company [ECF No. 1 ¶ 88].

**Events Following Execution of the SAFE Agreement**

In late September 2021, Defendants withdrew Plaintiff's $7.4 million contribution from escrow [ECF No. 1 ¶ 85].  On October 19, 2021, Sawyer emailed Holmes to check on the status of the investment and asked what Plaintiff could expect in the way of reporting; Holmes responded

7

CASE NO. 22-81569-CIV-CANNON/Reinhart

that the Company would resume "normal reporting" [ECF No. 1 ¶ 86].  Plaintiff never received any written financials or other quarterly information [ECF No. 1 ¶ 86].

During a November 1, 2021, Zoom call between Holmes and Sawyer, Holmes said that "everything was going as planned and the Company had plenty of cash to operate," and that there was "significant interest" in a sale of all or part of the Company [ECF No. 1 ¶ 86].  According to Holmes, and reiterated in a November 4 email from the Company, the Company's Board of Directors was evaluating potential sale options with the help of a financial advisor and legal advisor [ECF No. 1 ¶ 86].  At no time did Defendants mention that the Company was in default [ECF No. 1 ¶ 86].

Eventually, beginning in December 2021, the Company's debt obligations began to come to light [ECF No. 1 ¶¶ 104–07].  On January 20, 2022, Sawyer and Whitcomb had a Zoom call during which Whitcomb informed Sawyer about the Company's financial problems, including the various defaults [ECF No. 1 ¶ 109].  Whitcomb told Sawyer "unequivocally that Wrigley grossly mismanaged the Company" and was eventually forced to resign [ECF No. 1 ¶ 109].  Whitcomb elaborated by explaining that Wrigley would put the Company in situations where it was close to running out of money, and then Wrigley would "rescue the Company by offering to lend money at high rates of interest in order to enrich himself" [ECF No. 1 ¶ 109].  Sawyer was also informed that Wrigley had "initially failed to fund his SAFE commitment, yet had taken Plaintiff's $7.4 million without reaching the agreed-upon $50 million" [ECF No. 1 ¶ 109].

After gaining access to the Company's financial data, Plaintiff learned that "the Company used the proceeds from the SAFE to fund outstanding debt obligations, as opposed to using it to fund the capital and operating expenses that Defendants had all along represented it was to be used for" [ECF No. 1 ¶ 112].

On August 10, 2022, Plaintiff sent a letter to Company that proposed to tender its shares to the Company in exchange for the return of its $7.4 million investment, including the applicable interest, costs, and fees; however, Plaintiff received no response [ECF No. 1 ¶ 114].

**Procedural History**

On the basis of these allegations, Plaintiff filed a six-count Complaint, asserting the following claims:

(1) Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5, when they made false and materially misleading statements to entice Plaintiff to invest in the SAFE [ECF No. 1 ¶¶ 122–27] (**Count I** – Violations of § 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants);

(2) Wrigley, Holmes, and Whitcomb violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78, because as controlling persons of the Company they are liable for the Company's violations of the securities laws [ECF No. 1 ¶¶ 128–34] (**Count II** – Violations of Sections 20(a) of the Exchange Act Against Wrigley, Holmes, and Whitcomb);

(3) Defendants violated the Georgia Uniform Securities Act, Ga. Code. Ann. § 10-5-58, when they made false and materially misleading statements to Plaintiff during the negotiation of the SAFE Agreement [ECF No. 1 ¶¶ 135–41] (**Count III** – Violation of Georgia Uniform Securities Act of 2008 (Blue Sky Laws), Ga. Code Ann. § 10-5-58 Against All Defendants);

(4) Wrigley, Holmes, and Whitcomb are jointly and severally liable for the Company's violations of the Georgia Uniform Securities Act, Ga. Code Ann. § 10-5-58(g), by virtue of their positions of control and authority [ECF No. 1 ¶¶ 142–48] (**Count IV** – Violation of Georgia Uniform Securities Act of 2008 (Blue Sky Laws), Ga. Code Ann. § 10-5-58(g) Against Wrigley, Holmes, and Whitcomb);

(5) Defendants are liable for common law fraud and fraudulent inducement for the false and misleading statements they made to Plaintiff during the negotiation of the SAFE Agreement [ECF No. 1 ¶¶ 149–56] (**Count V** – Common Law Fraud/Fraudulent Inducement Against All Defendants); and

(6) Plaintiff is entitled to recission of its investment because Plaintiff made the investment in reliance on the misrepresentations provided by Defendants [ECF No. 1 ¶¶ 157–63] (**Count VI** – Recission Against the Company).

[ECF No. 1].

On December 19, 2022, Defendants filed the instant Motion, seeking dismissal for failure to state a claim under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure [ECF No. 38]. The Motion is ripe for adjudication [ECF Nos. 40, 41].

## LEGAL STANDARD

Rule 8(a)(2) requires complaints to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To avoid dismissal under Rule 12(b)(6), a complaint must allege facts that, if accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see* Fed. R Civ. P. 12(b)(6). A claim for relief is plausible if the complaint contains factual allegations that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 545). Conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal. *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

Securities fraud claims are subject to the heightened pleading requirements of Rule 9(b). *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). That rule requires a party to "state with particularity the circumstances constituting fraud or mistake," but allows "[m]alice, intent, knowledge, and other conditions of a person's mind" to be alleged generally. Fed. R. Civ. P. 9(b). The Eleventh Circuit has explained that:

> While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint to set forth (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

CASE NO. 22-81569-CIV-CANNON/Reinhart

*FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011).  Under Rule 9(b), it

is "sufficient to plead the who, what, when, where, and how of the allegedly false statements and

then allege generally that those statements were made with the requisite intent."  *Mizzaro*, 544

F.3d at 1237.

Further, to survive a motion to dismiss, a securities-fraud claim brought under Rule 10b–5

also must satisfy the special fraud pleading requirements imposed by the Private Securities

Litigation Reform Act (PSLRA).  15 U.S.C. § 78u-4.  The PSLRA requires a complaint to "specify

each statement alleged to have been misleading" and "the reason or reasons why the statement is

misleading."  15 U.S.C. § 78u–4(b)(1)(B).  It also requires, "with respect to each act or omission

alleged," that a complaint "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind."  *Id.* § 78u–4(b)(2)(A).  The required state of mind

is an "intent to defraud or severe recklessness on the part of the defendant."  *FindWhat*, 658 F.3d

at 1299 (quoting *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F.3d 783, 790

(11th Cir. 2010)).  And a "strong inference" is one that is "cogent and at least as compelling as any

opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rts.,*

*Ltd.*, 551 U.S. 308, 324 (2007).  Although factual allegations may be aggregated to infer scienter,

scienter must be alleged with respect to each defendant and with respect to each alleged violation

of the statute.  *Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004).  If these PSLRA

pleading requirements are not satisfied, the court "shall" dismiss the complaint.  15 U.S.C.

§ 78u–4(b)(3)(A).

## DISCUSSION

### I.      Fraud Claims (Counts I–V)

A review of the Complaint establishes that Plaintiff has met its burden under both Rule 8

and the heightened pleading standards of Rule 9(b) and the PSLRA.  Defendants argue that the

CASE NO. 22-81569-CIV-CANNON/Reinhart

fraud counts in the Complaint (Counts I-V) fail to adequately allege misrepresentations made by Defendants, subsequent reliance by Plaintiff on any alleged misrepresentations, and the requisite scienter under the PSLRA [ECF No. 38].  The Court disagrees, finding sufficient factual matter in the Complaint to satisfy the applicable heightened pleading standards.  The Court addresses each argument in turn, focusing on the particular allegations in the Complaint.

   a. **Misrepresentations**

   The Complaint raises five categories of misrepresentations allegedly made by Defendants during the course of the SAFE negotiations: (1) statements about the Company's existing default obligations; (2) statements about how long the SAFE funding would last; (3) statements about when Plaintiff's funds would be removed from escrow; (4) statements about how the SAFE funds would be used; and (5) statements about the Company's projected revenues.[3]

   To reiterate, Rule 9(b) requires a plaintiff to allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement, (3) the content and manner in which these statements misled the Plaintiffs, and (4) what the defendants gained in the alleged fraud."  *Brooks v. Blue Cross & Blue Shield of Fla, Inc*., 116 F.3d 1364, 1380–81 (11th Cir. 1997).  The PSLRA requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

   The Eleventh Circuit adheres to the "bespeaks caution" doctrine in assessing the materiality of forward-looking statements: "When an offering document's projections are accompanied by

---

[3] While the Motion to Dismiss also argues that Plaintiff's allegations relating "to the Company's negotiation of two debt deals" cannot amount to fraud [ECF No. 38 pp. 34–36], the allegations Defendants point to relate to Plaintiff's description of the Company's debt situation and are more appropriately analyzed in the context of statements about the Company's existing default obligations (Category 1 above).

CASE NO. 22-81569-CIV-CANNON/Reinhart

meaningful cautionary statements and specific warnings of the risks involved, that language may be sufficient to render the alleged omissions or misrepresentations immaterial as a matter of law." *S.E.C. v. Merch. Cap., LLC*, 483 F.3d 747, 767 (11th Cir. 2007). Further, "[s]tatements regarding future performance are actionable only if 'they are worded as guarantees or are supported by specific statements of fact or if the speaker does not genuinely or reasonably believe them.'" *FindWhat Inv. Grp.*, 658 F.3d at 1304 (quoting *Merch. Cap., LLC*, 483 F.3d at 767).

First, the Complaint identifies with particularity Defendants' failure to disclose material information about the Company's existing default obligations to Plaintiff throughout the SAFE funding negotiations. Plaintiff points to key information that was not disclosed during the SAFE negotiations: "[the Company's] inability to satisfy the Bergmann debts [and] the impact of the PE Fund Note and the Company's consequent debt default of $300 million of the Junior and Senior Notes" [ECF No. 40 p. 30]. Further, Plaintiff alleges that Defendants "concealed that they called Plaintiff's SAFE funds from escrow with full knowledge that the Company would incur numerous additional defaults on that $300 million imminently" [ECF No. 40 p. 30]. The Complaint's allegations bear out Plaintiff's argument, contrary to Defendants' position [ECF No. 38 pp. 36–38 (arguing that any omissions were not false or material, and furthermore, that Defendants had no duty to disclose the defaults to a sophisticated investor like Plaintiff)]. As alleged, Holmes and Whitcomb, by virtue of their senior-level positions in the Company (Chief Strategy Officer and Chief Development Officer, respectively), knew during the SAFE negotiations in August through September 2021 that the Company had very large debts coming due immediately thereafter—indeed, the forbearance on the Green Health Note expired a mere forty-eight days after Plaintiff executed the SAFE Agreement, which obligated the Company to pay Green Health $54 million by November 1, 2021 [ECF No. 1 ¶¶ 45, 100], with other payment obligations following soon thereafter [ECF No. 1 ¶¶ 3–4]. In total, as of September 20, 2021, the date Plaintiff wired its

13

CASE NO. 22-81569-CIV-CANNON/Reinhart

$7.4 million investment, the "Company was about to experience a cascade of defaults on $300 million of its outstanding debt beginning *just three days later*" [ECF No. 1 ¶ 3 (emphasis added]. At no time during the SAFE negotiations were these very significant and looming obligations disclosed to Plaintiff [ECF No. 1 ¶ 64].   Instead, as alleged with sufficient detail, Defendants painted a rosy picture of the Company's future while hiding these massive debts [ECF No. 1 ¶ 69 (projecting the Company's revenue for 2022 at $618 million with an adjusted EBITDA of $167 million)].   These allegations are sufficient at this stage to yield a strong inference that Defendants omitted material information about the Company's default obligations in their negotiations with Plaintiff.   "Materiality is proved by showing a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"   *S.E.C. v. Ginsburg*, 362 F.3d 1292, 1302 (11th Cir. 2004) (quoting *TSC Indus., Inc. v. Northway, Inc*., 426 U.S. 438, 449 (1976)).   Plaintiff alleges that it would not have provided funds for the SAFE "if it had been aware of the misstatements and omissions made by the Defendants" [ECF No. 1 ¶ 126].   This is reflected by Plaintiff's repeated requests for information during the course of the negotiations [ECF No. 1 ¶¶ 74, 76, 80 ("Sawyer underscored more urgently that Plaintiff was interested in a SAFE investment solely if the Defendants could provide reasonable assurance that the Company had sufficient capital to operate until a sale, and what amount of capital that was.")].   The omissions alleged in the Complaint are of the type that "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"   *See Ginsburg*, 362 F.3d at 1302.

Second, the Complaint sufficiently alleges that Defendants misrepresented the amount of time that the SAFE funding would last.   Defendants argue that the Complaint does not contain "particularized allegations giving rise to a strong inference that the debt situation rendered it impossible that the funds would last through the second quarter of 2022" [ECF No. 38 p. 31].

14

However, Plaintiff notes that the SAFE funding "was not sufficient—nor could it ever have been sufficient given the debt the Company had been saddled with" [ECF No. 40 p. 33].  The allegations in the Complaint bolster Plaintiff's argument and lead to a strong inference that Defendants' statements regarding the sufficiency of the SAFE funding were false.  On several occasions, Defendants told Plaintiff that "the SAFE funding would be sufficient to fund the Company—and specifically its capital and operating expenses—until a private sale could be consummated" [ECF No. 1 ¶ 73; *see also* ECF No. 1 ¶¶ 66, 74, 76, 80].  Viewing these statements against the background knowledge that Holmes and Whitcomb had about the Company's looming debt obligations supports a strong inference that the statements were false and misleading.  Indeed, as alleged, Holmes and Whitcomb knew at the time they made these statements that the Company had incurred debts well in excess of $50 million, with defaults on at least some of those debts imminently approaching [*See* ECF No. 1 ¶ 13].  Upon a review of the allegations in the Complaint, Plaintiff has adequately alleged that Defendants' statements regarding the sufficiency of the SAFE funding to "bridge" the gap until the Company could be sold were false given the rapidly approaching debts, which the Company did not have sufficient capital to meet.

Third, turning to the issue of when Plaintiff's funds would be removed from escrow, Defendants made similar misrepresentations assuring Plaintiff that its $7.4 million contribution would not be removed from escrow until the investments in the SAFE fund totaled $50 million. Plaintiff argues that Sawyer repeatedly sought an assurance from Defendants that its funds would remain in escrow until the total SAFE fund reached $50 million "as a condition of its investment," and in return, received reassurances that the funds would not be moved until that time [ECF No. 40 pp. 35–36].  Defendants dispute Plaintiff's characterization of those statements as misrepresentations, adding that, although the SAFE fund had not reached the $50 million when Plaintiff's funds were disbursed, the fund did ultimately reach the promised $50 million investment

CASE NO. 22-81569-CIV-CANNON/Reinhart

level two months post disbursement (in November 2021) [ECF No. 38 pp. 32–33]. At this stage, taking the detailed allegations in the Complaint as true, the Court agrees with Plaintiff that Defendants made material misrepresentations about when Plaintiff's money would be removed from escrow. The Complaint specifies, for example, at least two occasions during which Defendants told Plaintiff that its funds would be held in escrow until the SAFE fund had $50 million in investments [ECF No. 1 ¶¶ 76, 79]. In particular, the Complaint includes a statement by Whitcomb in an email in which he told Plaintiff that "[a]ny paperwork you sign prior to [$50 million being received] will be held in escrow until close" [ECF No. 1 ¶ 79]. The Complaint also alleges that Plaintiff relied on these statements in making its decision to invest in the SAFE fund [ECF No. 1 ¶ 85 ("In particular, it was the Defendants' misrepresentations that the preconditions for releasing Plaintiff's signatures from escrow and closing its $7.4 million investment—*i.e.*, the remaining SAFE investment totaled at least $50 million—that induced Plaintiff to execute the SAFE and to deposit the funds in the first instance.")]. Despite these reassurances, the Complaint adequately alleges that Whitcomb informed Plaintiff in January 2022 that, in late September 2021, Defendants "had taken Plaintiff's $7.4 million [from escrow] without reaching the agreed-upon $50 million" [ECF No. 1 ¶ 109]. On this record, the Complaint contains sufficiently particularized allegations from which the Court can infer, under the applicable heightened pleading standards, that Defendants made material misrepresentations about the timing condition for removing Plaintiff's funds from escrow.

The same conclusion follows when analyzing Defendants' statements about how the SAFE funding would be used—that is, that Defendants assured Plaintiff that the money would be a "bridge" for the Company's operating expenses until a sale was concluded [ECF No. 1 ¶¶ 66, 73–75 (Holmes and Whitcomb describing how the SAFE funds would be used), 80]. Plaintiff argues that these statements were misleading because the funds could never "have been sufficient

16

CASE NO. 22-81569-CIV-CANNON/Reinhart

given the debt the Company had been saddled with" [ECF No. 40 p. 30].  Defendants disagree, arguing that, as an initial matter, the Complaint does not contain any "well-pled allegations that the Company did *not* use the SAFE funds for capital and operating expenses" [ECF No. 38 p. 29 (emphasis in original)].  Even assuming the funds were not used for capital and operating expenses, Defendants argue that the SAFE Agreement Risk Factors gave them broad discretion to utilize the funds, so even if Defendants stated that the money would be used to pay the Company's operating expenses, that alone would not qualify as an actionable misrepresentation because that was one possible use among many allowed by the language of the risk factors [ECF No. 38 pp. 29–30; *see also* ECF No. 39-3 p. 3 ("Management will have broad discretion in the use of the Company's cash, cash equivalents, and investments, and may not use them effectively.")].

Following careful review, and under the applicable pleading standards, the Court agrees with Plaintiff; the Complaint contains sufficient allegations indicating that, at the time Defendants made the subject "bridge" statements about their plans for the SAFE funds, "Defendants understood at that time that they would shortly be obligated to use SAFE funds to pay outstanding debt obligations" [ECF No. 40 p. 31].  This is bolstered by the allegations in the Complaint. Defendants reassured Plaintiff on multiple occasions that its contribution to the SAFE fund would be sufficient to "bridge" the Company through the fiscal year, and that the funds would not be repurposed to cover the Company's existing debts [ECF No. 1 ¶¶ 66, 73–75].  Plaintiff specifically informed Defendants that it would commit money to the SAFE fund only if "the funds raised in connection with the SAFE would be a sufficient bridge until the Company could be sold" [ECF No. 1 ¶ 76].  In response to each inquiry from Plaintiff, Holmes and Whitcomb continued to reiterate that the SAFE fund would be sufficient to cover the Company's operating expenses in the interim.  However, as the Complaint alleges in great detail, Holmes and Whitcomb did so with the knowledge that the Company had severe impending debts, and that the "Company actually

CASE NO. 22-81569-CIV-CANNON/Reinhart

intended to use the SAFE proceeds to attempt to pay looming debt obligations to other investors"
[ECF No. 1 ¶ 66].  Nowhere in the Risk Factors that Defendants now seek to use as a shield for
liability were the impending debts, or the use of the SAFE funds to meet them, mentioned [*see*
ECF No. 39-3].  The Risk Factors were given to Plaintiff against the backdrop of Defendants'
statements about how the funds were to be used and cannot now, as Defendants argue, be used at
the motion to dismiss stage to bar liability for misrepresentations made during the SAFE
negotiations.   On the contrary, the allegations provided give rise to a strong inference that
Defendants' reassurances about the way the SAFE funding would be utilized were made without
a genuine or reasonable belief in their truth.  *See FindWhat Inv. Grp.*, 658 F.3d at 1304 (quoting
*Merch. Cap., LLC*, 483 F.3d at 767).

    The final category of alleged misrepresentations relates to Defendants' statements about
the Company's projected revenues [ECF No. 1 ¶ 69 (chart showing Company's projected
revenue)].  Defendants say these statements were forward-looking projections protected by the
bespeaks caution doctrine [ECF No. 38 pp. 27–29].  Plaintiff responds that "Defendants could not
have believed their own upbeat projections given the massive amount of debt the Company was
burdened with at the time" [ECF No. 40 p. 27].  Plaintiff further argues that any cautionary
language accompanying Defendants' projections was "meaningless," because "the Company was
in a debt crisis at the time Defendants generated their forecasts" [ECF No. 40 p. 29].  The Court
has reviewed these competing positions and concludes as follows: while the misrepresentations
regarding revenue, standing alone, may not be actionable, when added to the surrounding
circumstances, the statements bolster the already strong and particularized inference of material
misrepresentations and omissions and further support the denial of Defendants' motion to dismiss.

    For these reasons, the allegations in the Complaint are sufficient at this stage to show
material misrepresentations and omissions made by Defendants during the course of the SAFE

CASE NO. 22-81569-CIV-CANNON/Reinhart

negotiations.

### b. Reliance

The Complaint similarly contains a sufficient basis from which the Court can conclude that Plaintiff relied on the alleged misrepresentations and omissions made by Defendants. The Complaint contains three different types of fraud claims: (1) federal securities fraud (Counts I & II); (2) Georgia securities fraud (Counts III & IV); and (3) common law fraud (Count V). Defendants argue that the non-reliance clause contained in the SAFE Agreement [ECF No. 39-1 § 4(c)] shows that Plaintiff could not have reasonably relied on the statements made during the negotiations. The Court addresses the application of the non-reliance clause to each type of claim separately.

To begin, Plaintiff has shown, accepting the allegations in the Complaint as true, that it relied on Defendants' misrepresentations and omissions in a manner sufficient to satisfy the requirements of federal securities law. "[A] plaintiff in a § 10(b) suit must demonstrate reliance—that is, that he or she actually relied upon the alleged misrepresentation." *Meyer v. Greene*, 710 F.3d 1189, 1194 (11th Cir. 2013). The most direct way for a plaintiff "to demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 461 (2013). Plaintiff has done so here. Plaintiff specifically pleads that it relied on the statements made during the course of the SAFE negotiations [ECF No. 1 ¶¶ 115–16]. This reliance is also clear from the other allegations contained in the Complaint. Plaintiff was aware of the statements made by Holmes and Whitcomb and repeatedly sought reassurances based on the information Defendants had provided [ECF No. 1 ¶¶ 76, 80]. After a month-long negotiation period with multiple conversations via Zoom and email, Plaintiff paid $7.4 million into the SAFE fund [ECF No. 1 ¶¶ 62–83 (detailing SAFE negotiations)]. These

CASE NO. 22-81569-CIV-CANNON/Reinhart

allegations are sufficient to show that Plaintiff relied on the misrepresentations and omissions made by Defendants during the SAFE negotiations.

The non-reliance clause in the SAFE Agreement does not dictate a different result at this stage. The Eleventh Circuit has "never held that, regardless of the circumstances, an investor is always precluded from recovering under Rule 10b–5 if the misrepresentations upon which the investor relied were oral and conflict in some way with contemporaneous written representations available to the investor." *Bruschi v. Brown*, 876 F.2d 1526, 1529 (11th Cir. 1989). Instead, a court can consider the following factors in determining whether the investor's reliance was justified: "(1) the sophistication and expertise of the plaintiff in financial and security matters; (2) the existence of long standing business or personal relationships between the plaintiff and the defendant; (3) the plaintiff's access to relevant information; (4) the existence of a fiduciary relationship owed by the defendant to the plaintiff, (5) concealment of fraud by the defendant; (6) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (7) the generality or specificity of the misrepresentations." *Id.* Here, accepting the allegations in the Complaint as true, the *Bruschi* factors weigh in favor of finding that Plaintiff was justified in relying on Defendants' statements. While Plaintiff is a sophisticated investor [ECF No. 1 ¶ 62 (noting that Plaintiff was initially introduced to Holmes and Wrigley in relation to its PIPE investment)], the Complaint only shows a nine-month relationship between Plaintiff and Defendants prior to the SAFE Agreement being executed [ECF No. 1 ¶ 62 (detailing January 28, 2021, as Plaintiff's first interaction with Wrigley and Holmes)]. Moreover, although are no allegations that Defendants owed a fiduciary duty to Plaintiff or that Defendants actively concealed fraud, Plaintiff could not have otherwise accessed the relevant information, as Defendants were in

sole possession of the information about their Company's default obligations,[4] and this information was not disclosed during the course of the negotiations [ECF No. 1 ¶¶ 64, 75, 80]. It is also unclear from the allegations in the Complaint who initiated the SAFE negotiations—i.e., Plaintiff or Defendants [ECF No. 1 ¶ 63 (detailing the beginning of negotiations)]. However, the misrepresentations on which the Complaint relies are specific and detailed, including as to the plan for releasing the funds from escrow, the purpose for which Defendants were soliciting the funds, the particularized revenue projections and related statements, and how the funds were going to be used [ECF No. 1 ¶¶ 65–69, 72, 73–75, 79]. Given the parties' brief relationship, the fact that the misrepresentations concerned information solely in Defendants' possession, and the specificity of the alleged misrepresentations, the Court finds that Plaintiff's reliance on Defendants' misrepresentations was justified sufficient to survive a Rule 12(b)(6) challenge.

The same conclusion follows with regard to Plaintiff's claims for violations of Georgia's securities laws. The Georgia Uniform Securities Act under which Plaintiff brings Counts III and IV requires that a plaintiff satisfy similar elements to those required by Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), including that the plaintiff relied on the misstatements or omissions. *GCA Strategic Inv. Fund, Ltd. v. Joseph Charles & Assocs., Inc.*, 537 S.E.2d 677, 682 (Ga. Ct. App. 2000). As such, the Court finds adequate reliance by Plaintiff for the reasons stated above. Defendants argue, however, that the non-reliance clause in the SAFE Agreement precludes Plaintiff's claims, because the existence of that clause shows that Plaintiff cannot "explain how its SAFE investment was procured 'by means of' Defendants' alleged misrepresentations if Plaintiff did not rely on them" [ECF No. 41 p. 22]. However, the Georgia Supreme Court has made clear that "[t]o allow a purchaser to waive by contract at the time of

---

[4] [ECF No. 1 ¶¶ 30–61 (information about the Company's capital structure and debts); ECF No. 1 ¶ 110 (noting that Plaintiff was not provided access to the Company's data room until January 20, 2022)]

CASE NO. 22-81569-CIV-CANNON/Reinhart

purchase all violations of the Securities Act would eviscerate the very protections afforded by the statute and such a purported waiver would be void and of no effect." *Meason v. Gilbert*, 226 S.E. 2d 49, 50 (Ga. 1976). That principle applies here; Section 3(c) of the SAFE Agreement states that "[t]he performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule, or regulation applicable to the Company" [ECF No. 39-1 § 3(c)]. This provision asks Plaintiff, in signing the SAFE Agreement, to warrant that the agreement "does not and will not" violate the securities laws. As such, the non-reliance clause does not, on its own, operate to bar Plaintiff's claims. *See Meason*, 226 S.E. 2d at 50. Plaintiff has adequately pled reliance as to its Georgia securities law claims.

Finally, the Court turns to Plaintiff's common law fraud claim in Count V and agrees with Plaintiff that it adequately alleges reliance under Florida law.[5] *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985). The main dispute here is whether the non-reliance clause operates to bar the common law fraud claim. It does not. The parties agree that Delaware law determines the non-reliance clause's application to the common law claim because Section 5(f) of the SAFE Agreement provides that "[a]ll rights and obligations hereunder will be governed by the laws of the State of Delaware" [ECF No. 39-1 § 5(f); *see also* ECF No. 38 p. 44; ECF No. 40 p. 48]. Though Defendants are correct that the general rule under Delaware law is that non-reliance clauses bar a plaintiff from later bringing a fraud claim based on supposedly disclaimed misrepresentations, *see RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 117 (Del. 2012), the non-reliance clause must be clear to have that barring effect. *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004) ("In all of the decisions in which this court has found that fraud claims were barred by contractual provisions, the court has concluded that the contract's terms,

---

[5] The parties do not dispute that Florida law governs the substantive elements of the common law fraud claim in Count V even if Delaware law governs the impact of the non-reliance clause on the reliance prong of the substantive claim [ECF No. 38 p. 44 n. 15; ECF No. 40 pp. 48–49].

CASE NO. 22-81569-CIV-CANNON/Reinhart

when read together, constituted a clear statement by the plaintiff that it was not relying on the very factual statements that the plaintiff was contending to be fraudulent.").  Put another way, "for a contract to bar a fraud in the inducement claim, the contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." *Id.*  That is not the case here.  The non-reliance clause Defendants seek to use as a shield to bar Plaintiff's common-law fraud claims is Section 4(c) of the SAFE Agreement, which reads, in relevant part, "[t]he Investor confirms that no representations or warranties have been made to the Investor other than pursuant to Section 3 hereof and that the Investor has not relied on any representation or warranty in making or confirming the Investor's investment other than pursuant to Section 3 hereof" [ECF No. 39-1 § 4(c)].  This provision is muddled by the provision in Section 4(e), which states that "[t]he investor acknowledges that it is not relying upon any person, other than the Company and its officers and directors, in making its investment or decision to invest in the Company" [ECF No. 39-1 § 4(e)].  The misrepresentations Plaintiff raises as a basis for its common law fraud claim were made by Holmes, Whitcomb, and Wrigley, all of whom were officers and directors of the Company [*see* ECF No. 1 ¶¶ 23 (denoting Wrigley as Chairman and CEO), 24 (denoting Holmes as director and Chief Strategy Officer), 25 (denoting Whitcomb as Chief Development Officer and eventual CEO)].  As such, it is not clear that the non-reliance clause in Section 4(c) of the SAFE Agreement bars Plaintiff from relying on the statements made by Holmes, Wrigley, and Whitcomb during the SAFE negotiations.  Because the language in the SAFE agreement does not "add up to a clear anti-reliance clause," the Court disagrees with Defendants' view that the non-reliance clause bars Plaintiff's common law fraud claim as a matter of law.  *See Kronenberg*, 872 A.2d at 593.

CASE NO. 22-81569-CIV-CANNON/Reinhart

### c. Scienter

Defendants' argument that the Complaint does not contain sufficient allegations of scienter on the part of Holmes, Wrigley, and Whitcomb fails when viewed in light of the Complaint's detailed description of their knowledge throughout the SAFE negotiations. The PSLRA requires that "in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *FindWhat Inv. Grp.*, 658 F.3d at 1300. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* To make this finding, courts are permitted to aggregate facts. *Phillips*, 374 F.3d at 1017 ("We readily join the courts that have interpreted the PSLRA to permit the aggregation of facts to infer scienter."). This scienter requirement applies to Plaintiff's Georgia securities fraud claims (Counts III and IV)[6] and Florida common law fraud claim (Count V)[7] as well as the federal securities fraud claims (Counts I and II).

Defendants argue that Plaintiff has failed to adequately allege scienter as to any of the individual Defendants because the allegations in the Complaint are "conclusory" and rely too

---

[6] *Keogler v. Krasnoff*, 601 S.E.2d 788, 791 (2004).

[7] Under Florida common law, "scienter, can be established by either one of the three following phases of proof: (1) That the representation was made with actual knowledge of its falsity; (2) without knowledge either of its truth or falsity; (3) under circumstances in which the person making it ought to have known, if he did not know, of its falsity." *Parker v. State of Fla. Bd. of Regents ex rel. Fla. State Univ.*, 724 So.2d 163, 168 (Fla. Dist. Ct. App. 1998).

24

CASE NO. 22-81569-CIV-CANNON/Reinhart

heavily on Defendants' positions as officers and directors of the Company [ECF No. 38 pp. 45–55]. Although it is true that a party's position is not sufficient to support a finding of scienter, *see Durgin v. Mon*, 415 F. App'x 161, 165 (11th Cir. 2011), Defendants' argument ignores the plethora of allegations in the Complaint about what each of the Defendants knew at the time the alleged misrepresentation was made. To analyze the Complaint's allegations effectively, the Court deals with each of the individual Defendants in turn.

Beginning with Whitcomb, the Complaint contains sufficient allegations from which the Court can infer that he acted with the required state of mind. Whitcomb was functioning as the Company's Chief Development Officer during the SAFE negotiations [ECF No. 1 ¶ 25]. He was a key part of the SAFE negotiations. He attended meetings with Plaintiff where he and Holmes provided Plaintiff with detailed financial information about the Company [ECF No. 1 ¶¶ 67–69, 73–76]. He also affirmatively represented to Plaintiff in an email that the SAFE funds would not be pulled from escrow until the funds totaled $50 million [ECF No. 1 ¶ 79]. His knowledge is further illustrated by the allegations in the Complaint that during a January 2022 meeting after Whitcomb became CEO of the Company, Whitcomb told Plaintiff that "Wrigley created the situation where the Company was close to running out of money on various occasions, and then Wrigley would rescue the Company by offering to lend money at high rates of interest in an effort to enrich himself" [ECF No. 1 ¶ 109]. Whitcomb also informed Plaintiff during that same meeting that "Wrigley initially failed to fund his SAFE commitment, yet had taken Plaintiff's $7.4 million without reaching the agreed-upon $50 million" [ECF No. 1 ¶ 109]. Whitcomb's position, coupled with his detailed knowledge of the Company's financial status, is sufficient for the Court to draw a cogent inference at this stage of the litigation that Whitcomb acted with the requisite scienter in making the alleged misrepresentations to Plaintiff.

The allegations against Holmes are even more robust. Not only was Holmes the

Company's director and Chief Strategy Officer during the negotiations [ECF No. 1 ¶ 24], but the Complaint alleges that he was heavily involved in the Company's negotiations to acquire the Green Health Notes [ECF No. 1 ¶ 41 ("Wrigley's lieutenant, Holmes, represented Green Health in the transaction.")].  This makes clear, from a pleading perspective, that Holmes had knowledge of at least some, if not all, of the Company's existing default obligations.  With this knowledge, Holmes engaged in the SAFE negotiations with Plaintiff where he provided Plaintiff with detailed financial information about the Company [ECF No. 1 ¶¶ 65–83].  At no time during these negotiations did Holmes mention the Green Health Notes or any of the Company's other default obligations [ECF No. 1 ¶ 64].  Taken together, the allegations in the Complaint are sufficient to plead scienter on the part of Holmes.

Though Wrigley was only a small part of the SAFE negotiations, the Complaint's allegations detail his involvement with both the Company's existing debt obligations and the SAFE fund itself, the combined effect of which is sufficient to establish scienter at this stage.  During the course of the SAFE negotiations, Wrigley operated as CEO of the Company [ECF No. 1 ¶ 23].  He was a major player in the Company's decision to enter into the Green Health and PE Fund Notes [ECF No. 1 ¶¶ 39–48, 55–58].  He served as the Chairman and CEO of Green Health [ECF No. 1 ¶ 39] and had an inside track to PE Fund [ECF No. 1 ¶ 55 (stating that Wrigley's "namesake family office is the General Partner" of PE Fund)].  These allegations, accepted as true, sufficiently plead Wrigley's clear knowledge about the Company's default obligations at the time the SAFE negotiations were ongoing.  Wrigley was also personally involved in the SAFE negotiations, though not to the same extent as Holmes and Whitcomb.  He participated in at least one Zoom call with Plaintiff where the SAFE investment was explained [ECF No. 1 ¶ 65].  Wrigley also was copied on at least two emails between Holmes and Plaintiff discussing the SAFE fund and the Company's finances [ECF No. 1 ¶¶ 67, 70].  Though his involvement with Plaintiff lessened in

CASE NO. 22-81569-CIV-CANNON/Reinhart

the later days of the SAFE negotiations, the Complaint's allegations make it clear that he was aware of the negotiations and was an active participant in them.  The Complaint alleges that Holmes and Whitcomb told Plaintiff that Wrigley had committed $5 million to the SAFE investment [ECF No. 1 ¶ 76].  Wrigley also sent an email to investors regarding the Company's decision not to go forward with the SPAC transaction [ECF No. 1 ¶ 101].  And in November 2021, Wrigley eventually invested $10.5 million of his personal funds into the SAFE to meet the $50 million initial requirement [ECF No. 1 ¶ 103].  These allegations as to Wrigley are sufficient at this juncture to meet the heightened pleading requirements attendant to Plaintiff's various fraud claims.

As a final point, under the PSLRA, "personal financial gain may weigh heavily in favor of a scienter inference."  *Tellabs, Inc.*, 551 U.S. at 325.  The Complaint shows a motivation on the part of Defendants to fund the SAFE in order to avoid the collapse of the Company under the weight of its looming debt [ECF No. 1 ¶ 118].  Wrigley, especially, stood to gain personally from any success of the SAFE as it would help alleviate the Company's financial burdens and ensure that his other related companies, Green Health and PE Fund, received their payments [ECF No. 1 ¶ 118].  These allegations of personal financial gain on the part of Defendants bolster the Court's ultimate conclusion that scienter is adequately pled in the Complaint.

## II.    Control Liability

Having found that the Complaint alleges sufficient facts to state a claim for securities fraud under federal law, Georgia statutory law, and Florida common law, the Court now considers whether Whitcomb, Holmes, and Wrigley can be held jointly and severally liable for the Company's securities violations.  A review of the facts in the Complaint answers that question in the affirmative.

Section 20(a) of the Securities Act imposes joint and several liability on "control persons"

CASE NO. 22-81569-CIV-CANNON/Reinhart

of the entity liable under federal securities law. *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 721 (11th Cir. 2008). The statute provides, in relevant part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t. The relevant regulation defines control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. This determination is "dependent on the particular factual circumstances of each case." *Laperriere*, 526 F.3d at 723. Georgia law similarly imposes joint and several liability on "[a] person that directly or indirectly controls" or "[a]n individual who is a managing partner, executive officer, or director of" a party found to have violated the securities laws. Ga. Code Ann. § 10-5-58(g)(1)–(2).[8]

The Complaint contains sufficient factual allegations from which the Court can conclude that Whitcomb had sufficient "control" over the Company to be held jointly and severally liable for the Company's securities law violations. Whitcomb was the Company's Chief Development Officer [ECF No. 1 ¶ 25]. In that role, he negotiated the SAFE Agreement with Plaintiff, which ultimately led to an investment contract involving the Company and Plaintiff [ECF No. 1 ¶ 83; *see also* ECF No. 1 ¶¶ 62–83 (SAFE funding negotiations)]. This is sufficient to show that Whitcomb had the "power to . . . cause the direction of the management and policies of [the Company] by contract." *See* 17 C.F.R. § 230.405.

The same conclusion follows with respect to Holmes. Holmes, in his position as director and chief strategy officer [ECF No. 1 ¶ 24], was permitted to control the Company's position by

---

[8] The remainder of this section refers to the federal (Count I) and Georgia (Count II) securities law violations brought against the Securities Defendants collectively as "securities law violations."

CASE NO. 22-81569-CIV-CANNON/Reinhart

entering into contracts on behalf of the Company.  Not only did Holmes engage in the SAFE funding negotiations during which he provided Plaintiff with the initial draft of the SAFE Agreement [ECF No. 1 ¶ 67; *see also* ECF No. 1 ¶¶ 62–83 (SAFE funding negotiations)], but he was instrumental in the negotiations and ultimate signing of the Green Health Notes [ECF No. 1 ¶ 41].  More broadly, the allegations in the Complaint show Holmes in a position to obligate the Company in contracts for both debt (Green Health Notes) and investments by third parties (SAFE Agreement).  These allegations are sufficient for the Court to find, at this stage, that Holmes was a "control person" and thus jointly and severally liable for the Company's securities law violations.

Finally, in examining the allegations regarding Wrigley's conduct, Wrigley satisfies the definition of "control person" within the meaning of the statute and can be held jointly and severally liable for the Company's securities law violations.  As Chairman and CEO of the Company [ECF No. 1 ¶ 23], Wrigley had the power "to direct or cause the direction of the management and policies of" the Company.  *See* 17 C.F.R. § 230.405.  This is borne out by the allegations in the Complaint.  Wrigley entered into at least two large debt obligations on behalf of the Company, the Green Health and PE Fund Notes [ECF No. 1 ¶¶ 39, 55].  During his tenure as CEO, the Company also entered into a settlement with Bergmann wherein the Company was obligated to pay $38.5 million [ECF No. 1 ¶ 51].  Emails sent by Wrigley show his ability to steer the Company's direction [*see* ECF No. 1 ¶ 101 (detailing the email sent by Wrigley stating that the Company "would 'focus on alternative financing avenues to pursue a vast array of growth opportunities'")].  His large personal investment in the SAFE fund to ensure that it went forward further shows his control over the Company [ECF No. 1 ¶ 103].  Taken together, the allegations in the Complaint are more than sufficient to show that Wrigley had "control" over the Company in a way that would render him jointly and severally liable for the Company's violations of the federal securities laws.

In sum, Plaintiff has stated a claim at this stage for joint and several liability by the individual Defendants.

### III.    Recission Claim (Count VI)

Plaintiff has pled sufficient facts to state a claim for recission of the SAFE Agreement.

"Under Florida law, a plaintiff must adequately plead six facts in order to state a cause of action for rescission of a contract: '(1) [t]he character or relationship of the parties; (2) [t]he making of the contract; (3) [t]he existence of fraud, mutual mistake, false representations, impossibility of performance, or other ground for rescission or cancellation; (4) [t]hat the party seeking rescission has rescinded the contract and notified the other party to the contract of such rescission; (5) [i]f the moving party has received benefits from the contract, he should further allege an offer to restore these benefits to the party furnishing them, if restoration is possible; [and] (6) [l]astly, that the moving party has no adequate remedy at law.'" *Barber v. Am.'s Wholesale Lender*, 542 F. App'x 832, 836 (11th Cir. 2013) (alterations in original) (quoting *Billian v. Mobil Corp.*, 710 So. 2d 984 (Fla. Dist. Ct. App. 1998)).  Defendants argue that the allegations in the Complaint fail to meet the third, fourth, and sixth elements [ECF No. 38 p. 58].  The Court is unpersuaded.

First, Defendants argue that Plaintiff has not "adequately alleged that Defendants engaged in actionable fraud or otherwise intentionally made a misrepresentation" [ECF No. 38 p. 58]. However, as explained above, the Complaint adequately alleges that Defendants made material misrepresentations to Plaintiff during the course of the SAFE negotiations.   The Complaint therefore shows the existence of false representations sufficient to meet the third element.

The Complaint similarly shows that Plaintiff notified Defendants of its recission prior to initiating the instant suit.  While Defendants acknowledge the Complaint's allegation that Plaintiff sent the Company a letter that proposed to tender its shares in exchange for a return on its investment, Defendants argue that the letter was invalid, because it was addressed only to

CASE NO. 22-81569-CIV-CANNON/Reinhart

Whitcomb, who was no longer with the Company at the time the letter was sent [ECF No. 38 pp. 58–59]. Therefore, Defendants say they were "deprived of a meaningful opportunity to comply" [ECF No. 38 p. 59]. A review of the subject letter [ECF No. 39-4] belies Defendants' argument. As noted by Plaintiff in its opposition, the letter, though addressed only to Whitcomb, was mailed to the address provided for the Company on the SAFE Agreement [*see* ECF No. 39-1 p. 10]. According to the terms of the SAFE Agreement, "[a]ny notice required or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page" [ECF No. 39-1 § 5(b)]. Plaintiff followed those exact instructions and mailed the letter via overnight mail to the address listed on the signature page of the SAFE Agreement [*Compare* ECF No. 39-4, *with* ECF No. 39-1 p. 10]. The allegation in the Complaint that Plaintiff sent a letter to the Company on August 10, 2022, proposing to tender its shares in exchange for a return of its investment [ECF No. 1 ¶ 114] is therefore sufficient to meet the fourth element.

Finally, Defendants argue that Plaintiff's recission claim is barred because Plaintiff has failed to allege the absence of an adequate remedy at law [ECF No. 38 p. 59]. However, Plaintiff's request for recission is pled as an alternative to its request for damages [*See* ECF No. 1 ¶ 164 (seeking an award for damages "and/or recission of Plaintiff's SAFE investments")]. As such, it is premature at this stage for the Court to determine whether Plaintiff's other claims will ultimately succeed. Plaintiff will therefore be permitted to plead its recission claim in the alternative to its fraud claims in Counts I–V. *See Frayman v. Douglas Elliman Realty, LLC*, 515 F. Supp. 3d 1262 (S.D. Fla. 2021) (Altonaga, J.) (noting that whether an adequate remedy at law is available is a question of fact that cannot be determined at the motion to dismiss stage).

The allegations in the Complaint are sufficient at this stage to plead a claim for recission. Count VI will be permitted to proceed.

CASE NO. 22-81569-CIV-CANNON/Reinhart

**CONCLUSION**

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendants' Combined Motion to Dismiss Plaintiff's Complaint [ECF No. 38] is **DENIED**.

2. Defendants shall file an answer to the Complaint on or before **October 23, 2023**.

3. On or before **October 30, 2023**, the parties shall file a **joint** scheduling report containing all of the information specified in Local Rule 16.1 along with a Joint Proposed Scheduling Order that is both attached as an exhibit on CM/ECF and sent in Word format via email to cannon@flsd.uscourts.gov.

4. In addition, on or before **October 30, 2023**, the parties, including governmental parties, must file Certificates of Interested Parties and Corporate Disclosure Statements that contain a complete list of persons, associated persons, firms, partnerships, or corporations that have a financial interest in the outcome of this case, including subsidiaries, conglomerates, affiliates, parent corporations, and other identifiable legal entities related to a party.  Throughout the pendency of the action, the parties are under a continuing obligation to amend, correct, and update the Certificates.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 6th day of October 2023.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record